**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

INDEPENDENCE FEDERAL SAVINGS BANK, )
    et al.,                      )
                              )
    Plaintiffs,        )   C.A. No. 07 2090 JDB
                              )
    v.                      )
                              )
1225 CONNECTICUT CO. L.L.C.,  )
    et al.,                    )
                              )
                              )
    Defendants.        )
_____)

## PLAINTIFFS' MOTION TO REMAND AND FOR COSTS AND ATTORNEYS FEES

Pursuant to 28 U.S.C. Section 1447(c), Plaintiffs
Independence Federal Savings Bank and Stanley W. Parsons, by and
through their undersigned counsel, hereby move to remand this
case back to the District of Columbia Superior Court and for an
award of their costs and attorneys fees incurred as a result of
the removal of the action to this Court.  In support hereof, the
Plaintiffs submit the accompanying Memorandum of Points and
Authorities.

Respectfully submitted,


COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.


____/s/_____
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202) 537-0700
efiling@cootermangold.com
*Attorneys for Plaintiffs*
 *Independence Federal Savings Bank*
 *and Stanley W. Parsons*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS BANK, )
    et al., )
    )
    Plaintiffs, )    C.A. No. 07 2090 JDB
    )
    v. )
    )
1225 CONNECTICUT CO. L.L.C., )
    et al., )
    )
    )
    Defendants. )
    )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
<u>PLAINTIFFS' MOTION TO REMAND AND FOR COSTS AND ATTORNEYS FEES</u>**

Plaintiffs Independence Federal Savings Bank and Stanley W. Parsons, by and through their undersigned counsel, hereby submit this Memorandum of Points and Authorities in support of their Motion to Remand and for Costs and Attorneys Fees and state as follows:

<u>INTRODUCTION</u>

Plaintiff Independence Federal Savings Bank ("IFSB" or the "Bank") is a federally-chartered savings bank, with its principal place of business in the District of Columbia. Complaint ("Compl.") at ¶2. The Bank operates two branches in the District of Columbia, one branch in Chevy Chase, Maryland, and one branch in Silver Spring, Maryland. Compl. at ¶2. The address of the Bank's headquarters is 1229 Connecticut Avenue, N.W., Washington, D.C. (the "Premises"), which is located in the building whose address is 1225 Connecticut Avenue, N.W., Washington, D.C. (the

"1225 Building"). Compl. at ¶2. Plaintiff Stanley W. Parsons ("Parsons"), a Virginia resident, is an employee of the Bank. Compl. at ¶3. Parsons is the Vice-President and Chief Information Officer. Compl. at ¶3. His office is located at the Premises. Compl. at ¶3. The Bank leases the Premises from Defendant 1225 Connecticut Co. LLC ("1225 LLC"). Compl. at ¶¶6, 12. Pursuant to an amendment to the original Lease, the lease term now extends through December 31, 2010. Compl. at ¶14. Notwithstanding the extension through December 31, 2010 of the lease term, IFSB was notified in the spring of 2007 that 1225 LLC would be undertaking an 18 month Repositioning Project at the 1225 Building, with initial construction set-up to begin July 23, 2007 and ending August 4, 2007; interior demolition to occur from August 2007 through April 2008; and exterior demolition to occur from April 2008 through June 2008. Compl. at ¶23. Defendant 1225 has identified its contractor for the project as Davis. Compl. at ¶22.

On October 23, 2007,[1] Plaintiffs IFSB and Parsons filed a Complaint in the District of Columbia Superior Court (2007 C.A.

---

[1] On July 31, 2007, Plaintiff IFSB filed a Complaint in this Court (C.A. 07-1389) against Defendant 1225 LLC primarily seeking to preliminarily and permanently enjoin the Repositioning Project ("First Federal Case"). Plaintiff alleged diversity of jurisdiction. After a hearing on the Plaintiff's Application for preliminary injunctive relief and the issuance of the Court's order denying that Application, the Plaintiff IFSB voluntarily dismissed that Complaint in the First Federal Case without prejudice pursuant to Rule 41(a)(1)(ii).

007075B) ("Superior Court Action") alleging that by undertaking the Repositioning Project, Defendant 1225 LLC has breached the lease, and that both Defendants have created a nuisance and have breached the Plaintiffs' rights to quiet enjoyment of the Premises. The Plaintiffs seek not only injunctive relief, but compensatory damages as well.  On November 14, 2007, the Defendants filed a Notice of removal of the Superior Court Action to this Court.  The Defendants assert that Plaintiff Parsons and Defendant Davis have been fraudulently/improperly joined as parties and that without Parsons and Davis, diversity jurisdiction exists, giving this Court jurisdiction over the claims between the remaining parties  - Plaintiff IFSB and Defendant 1225.  Plaintiffs submit that Defendants have failed to establish fraudulent/improper joinder and that, therefore, this Court does not have subject matter jurisdiction because there is no diversity.  Accordingly, Plaintiffs respectfully request the Court to grant their Motion and to remand this matter back to the District of Columbia Superior Court.

**ARGUMENT**

I.    **REMOVAL JURISDICTION IS TO BE STRICTLY CONSTRUED**

As this Court noted in its opinion in <u>Bhaqwanani v. Howard University</u>, 355 F. Supp. 2d 294 (D.D.C. 2005)(Bates, J.), "[b]ecause of the significant federalism concerns involved, this Court strictly construes the scope of its removal jurisdiction.

[citations omitted].  Accordingly, 'if federal jurisdiction is doubtful, a remand to state court is necessary.'" 355 Supp. 2d at 297 (quoting Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 815-16 (4th Cir. 2004)(en banc)).  Moreover, "'[b]ecause federal courts are courts of limited jurisdiction, the removal statute is to be strictly construed.' Kopff v. World Research Group, LLC, 298 F. Supp. 2d 50, 54 (D.D.C. 2003) [remaining citations omitted]. Therefore, in instances '[w]here the need to remand is not self-evident, the court must resolve any ambiguities concerning the propriety of removal in favor of remand.' Johnson-Brown v. 2200 M St. LLC, 257 F. Supp. 2d 175, 177 (D.D.C. 2003)[remaining citations omitted]." International Union of Bricklayers and Allied Craftworkers v. Insurance Company of the West, 366 F. Supp. 2d 33 (D.D.C. 2005).  See Storr Office Supply Division, A Division of Storr Office Environments, Inc. v. Radar Business Systems-Raleigh, Inc., 832 F. Supp. 154, 156  (E.D.N.C. 1993) ("removal statutes are strictly construed against removal, with any doubt in a particular case to be resolved against removal"); Lyall v. Air Tran Airlines, Inc., 109 F. Supp. 2d 365, 367 (E.D. Penn. 2000) (same).  As explained in more detail below, at best the Defendants have raised a factual ambiguity regarding whether Defendant Davis is a proper Defendant.  The resolution of this ambiguity, under the foregoing standards, must be against removal.

4

## II.  DEFENDANTS CANNOT MEET THEIR HEAVY BURDEN OF DEMONSTRATING FRAUDULENT/IMPROPER JOINDER

It is the Defendants' burden – not the Plaintiffs - to demonstrate that this Court has jurisdiction and that Plaintiffs' Motion for Remand should be denied.  In re Tobacco/Governmental Health Care Costs Litigation, 100 F. Supp. 2d 31, 35 (D.D.C. 2000); Bhagwanani, 355 F. Supp. 2d at 297 (party seeking removal "bears the burden of proving that jurisdiction exists in federal court"); International Union of Bricklayers, 366 F. Supp. 2d at 36 (same); National Organization for Women v. Mutual of Omaha Insurance Co., 612 F. Supp. 100, 103 (D.D.C. 1985) (removing defendant, not the plaintiff, bears the burden on plaintiff's remand motion).  Defendants have cited no case law in their Notice of Removal and rely exclusively on two Affidavits (as discussed below).  Where, as here, the Defendants contend that a defendant has been fraudulently joined, the Defendants' burden of establishing fraudulent joinder is a heavy one.  In re Tobacco, 100 F. Supp. 2d at 39; Brown v. Brown & Williamson Tobacco Corp., 26 F. Supp. 2d 74, 77 (D.D.C. 1998).  All disputed issues of fact and law must be resolved in Plaintiffs' favor.  Brown, 26 F. Supp. 2d at 77.

To establish fraudulent joinder, the Defendants must demonstrate "'either that there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant in state court; or that there has been

outright fraud in the plaintiff's pleadings of jurisdictional facts.'" <u>Brown</u>, 26 F. Supp. 2d at 76-77 (D.D.C. 1998)(quoting <u>B. Inc. v. Miller Brewing Co.</u>, 663 F.2d 545, 549 (5th Cir. 1981)). Fraudulent joinder must be proven by clear and convincing evidence. <u>Storr Office Supply Division, A Division of Storr Office Environments, Inc. v. Radar Business Systems-Raleigh, Inc.</u>, 832 F. Supp. 154, 156 (E.D.N.C. 1993). Due to the heavy burden a defendant bears in demonstrating fraudulent joinder, it is not sufficient for a defendant to show that defendant is likely to ultimately succeed in the action; "the defendant must show that the plaintiff has '*no possibility* of a right to relief.'" <u>Brown</u>, 26 F. Supp. 2d at 77 (quoting <u>Richardson v. Phillip Morris Inc.</u>, 950 F. Supp. 700, 702 (D. Md. 1997)) (emphasis in <u>Brown</u>). As explained by <u>B.Inc.</u>, "if there is even a possibility that a state court would find a cause of action stated against any one of the named in-state defendants on the facts alleged by the plaintiff, then the federal court must find that the in-state defendant(s) have been properly joined, and that there is incomplete diversity and that the case must be remanded to the state courts." <u>B. Inc.</u>, 663 F.2d at 550. Remand is appropriate unless the claims are "'wholly nonsensical.'" <u>Brown</u>, 26 F. Supp. 2d at 77 (quoting <u>Pulse One Communications, Inc. V. Bell Atlantic Mobile Systems, Inc.</u>, 760 F. Supp. 82, 84 (D. Md. 1991)). Whether or not a claim has merit is not to be

determined in considering the remand to the state court; the inquiry is limited to determining if the claim is "wholly nonsensical." Brown, 26 F. Supp. 2d at 77.  Where the federal court's jurisdiction is uncertain, "'a determination [of fraudulent joinder] should be made cautiously,'" Brown, 26 F. Supp. at 78 (quoting Pulse One, 760 F. Supp. at 84) and the case remanded to "allow the District of Columbia to decide whether or not the plaintiffs can state a valid cause of action under their . . . theory." Brown, 26 F. Supp. at 78.  See Lyall v. Airtran Airlines, Inc., 109 F. Supp. 2d 365, 374 (E.D. Penn. 2000) ("[w]e hasten to repeat that it is possible that these claims will ultimately be dismissed on remand, or that the defendants will prevail on summary judgment, but the important point here is that this is not our decision to make, but instead must be left to the state courts").

### A.  The Defendants Cannot Demonstrate that Parsons Was Fraudulently Joined

The Defendants contend that Plaintiff Parsons was fraudulently joined.  As noted by the Pulse One Court, it is only in rare circumstances that a plaintiff is asserted to have been fraudulently joined. Pulse One, 760 F. Supp. at 83-84 (noting that "[a]lmost all of the case law on improper joinder to destroy diversity involves non-divers defendants who are named or joined by plaintiffs wishing to keep a case from being removed to a federal court").  Plaintiffs will be considered to have been

7

fraudulently joined only if the defendant can demonstrate that the plaintiffs have "'absolutely no possibility' of prevailing on their claims, a determination that should be made cautiously by a court 'uncertain of its jurisdiction.'" Pulse One, 760 F. Supp. at 84 (quoting Glass Molders Intern. Union v. Wickes Cos., 707 F. Supp. 174, 181 (D.N.J. 1989)).

Essentially, Defendants assert that all Plaintiff Parson's claims have been concocted to destroy diversity.  In support, the Defendants point to the fact that Parsons was not a party to the First Federal Case and they assert that none of the claims in Counts II through V state causes of action.  The essence of Plaintiff Parsons claims is that as an employee lawfully present at the Premises, he is having to endure grave disruption to his workplace environment and has to suffer through noise, vibrations, risks to the computer equipment he is in charge of and risks to his own safety.  The Defendants assert in their removal petition that the new claims for nuisance and negligence, as well as the quiet enjoyment and third party contractual beneficiary claims of Plaintiff Parsons were "fashioned" and "inserted solely for the purpose of attempting to thwart removal."  Notice of Removal at ¶¶8, 9. They further assert that Counts II-V of the Superior Court Case "as a matter of law, fail to state a cause of action." Notice of Removal at ¶9.

The fact that the Superior Court Complaint contains a party

(Defendant Davis) and allegations and claims not found in the First Federal Case is due to the simple fact that the Repositioning Project is now four months further along than it was in July and August 2007 when the First Federal Case was filed.  In July and August 2007, demolition had not yet begun but now demolition is constant, as is the nuisance that it has created.  See e.g., Superior Court Complaint at ¶¶27-29, 39-41.

Defendants cannot demonstrate that Plaintiffs have "absolutely no possibility" of prevailing on Counts II through V or that those Counts are "wholly nonsensical."  Counts II through V allege a claim for breach of contract by Parsons a third party beneficiary of the quiet enjoyment provisions of the lease (Count II); a claim by both Plaintiffs against both Defendants for violation of the implied covenant of quiet enjoyment (Count III); a claim for nuisance by both Plaintiffs against both Defendants (Count IV); and a claim by both Plaintiffs against Defendant Davis for negligence (Count V).  All of these claims are allowable under District of Columbia law.  See e.g., Souci v. William C. Smith & Co., 763 A.2d 96 (D.C. App. 2000) (recognizing that, notwithstanding lack of contractual privity, property manager of co-operative building has common law duty of care to tenants and occupants in performance of repairs and also recognizing duty of property manager to exercise due care when "it engages in activities affecting [tenant/occupant's] enjoyment

9

of his tenancy"); <u>Anderson v. Washington Metropolitan Area</u>
<u>Transit Authority</u>, 1991 WL 197024 (D.D.C. 1991) (recognizing
claim for nuisance and negligence by person residing across from
construction project against contractor performing work); <u>Bostic</u>
<u>v. Henkels and McCoy, Inc.</u>, 748 A.3d 421 (D.C. app. 2000)
(contractor owes common law duty of care to those lawfully
present near construction site).  Thus, the Defendants cannot
sustain their burden of demonstrating that Plaintiff Parsons was
fraudulently joinder.

### B.    The Defendants Cannot Demonstrate that<br>Defendant Davis Was Fraudulently Joined

In their Notice of Removal, the Defendants (who cite no case
law), rely exclusively on the Affidavits of Neil D. Moodhe (the
President of Defendant Davis) and Simon Carney (Vice President
and Regional Counsel for Defendant 1225 LLC).  Neither of the
Defendants disputes that Defendant Davis is a Virginia citizen
for purposes of diversity.  Rather, Mr. Moodhe states in his
Affidavit that "DCS has not been engaged by 1225, or any of its
agents, to conduct any of the construction activity with respect
to the real property and improvements located at 1225 Connecticut
Avenue, N.W., Washington, D.C." and that "DCS is not performing
any construction activity at that property for any other entity
and, i[n] fact, has no presence at that site."  Affidavit of Neil
D. Moodhe In Support of Petition for Removal ("Moodhe Affid.") at
¶4; <u>see</u> <u>also</u> Affidavit of Simon Carney In Support of Petition for

10

Removal ("Carney Affid.") at ¶5 ("Defendant Davis Construction Services, LLC has not been engaged by 1225, or any of its agents, to conduct any of the construction activity at the Property"). Both Mr. Moodhe and Mr. Carney also aver that the "allegation 'on information and belief' by Plaintiffs to the contrary, as contained in Paragraph 68 of the Complaint is false and without foundation." Moodhe Affid. at ¶4; Carney Affid. at ¶5.

The Affidavits submitted by the Defendants do not provide "clear and convincing" evidence of fraudulent joinder and at best create an ambiguity.[2] The July 20, 2007 memo from Brookfield Properties to Plaintiff IFSB identified "Davis Construction" as the general contractor for the Repositioning Project. See 7/20/07 Memo attached hereto as Exhibit A. The business registration information available on-line on the District of Columbia's Department of Consumer and Regulatory Affairs web-site reveals that the only "Davis Construction" that has an active registration to do business in the District of Columbia is Davis Construction Services, LLC, the Virginia entity which Plaintiffs named as a Defendant. See print-out from http://mblr.dc.gov/corp/lookup/status, attached hereto as Exhibit B. There are signs posted at the construction site that identify "Davis Construction." See pictures attached as Exhibit

---

[2] Notably, neither Mr. Moodhe nor Mr. Carney identifies the entity that they contend is the contractor for the Repositioning Project.

11

C.[3]   In paragraph 9 of the Affidavit of Jackie S. Duke ("Duke

Affid."), submitted as Exhibit 1 in support of Defendant 1225

LLC's Memorandum of Points and Authorities in Opposition to

Plaintiff's Application for Preliminary Injunction filed in the

First Federal Case, Ms. Duke identifies "Davis Construction" as

the construction contractor for the project.[4]   Exhibit H to the

Duke Affidavit is a copy of the permit issued by the District of

Columbia Department of Transportation for the Repositioning

Project.   The permit is issued to "Davis Construction."   Because

any disputed issue of fact is to be resolved in Plaintiffs'

favor, the Plaintiffs are entitled to an inference that Defendant

Davis is the contractor involved with the Repositioning Project.

Because Plaintiff Parsons and Defendant Davis are not diverse,

this Court does not have jurisdiction and remand is appropriate.[5]

---

[3] The pictures were taken by Larry Alexander, an employee of
Plaintiff Bank.   See Declaration of Larry Alexander (attached
hereto as Exhibit D) at ¶3.

[4]  The Duke Affidavit, including Exhibit H thereto, is
attached hereto as Exhibit E.

[5]  As discussed above in Section A, the claims asserted in
the Superior Court Action are cognizable.   Accordingly the
Defendants have also failed to demonstrate that the claims
against Defendant Davis by either Plaintiff IFSB or Parsons are
wholly nonsensical.

## III.    <u>PLAINTIFFS SHOULD BE AWARDED THEIR COST AND ATTORNEYS FEES</u>

28 U.S.C. Section 1447(c) provides that "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."  The Plaintiffs request reimbursement of their costs and fees incurred as a result of the Defendants' removal of the Superior Court Action to this Court.  The Defendants have no support in law or fact for their broad statements that the Plaintiffs failed to state causes of actions or for their characterization of Plaintiffs' allegations "on information and belief" regarding the involvement of Davis Construction as being "false and without foundation."  Accordingly, Plaintiffs respectfully request the Court to order Defendants to pay their costs and attorneys fees.

<u>CONCLUSION</u>

For the foregoing reasons, the Plaintiffs respectfully request the Court to remand this case back to the District of Columbia Superior Court and to award the Plaintiffs their costs and attorneys fees incurred as a result of the Defendants' removal to this Court.

13

Respectfully submitted,


COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.


   /s/
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202) 537-0700
efiling@cootermangold.com
*Attorneys for Plaintiffs*
 *Independence Federal Savings Bank*
 *and Stanley W. Parsons*

14

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of November 2007, a copy of the foregoing Plaintiffs' Motion to Remand and for Costs and Attorneys Fees, Memorandum of Points and Authorities in support thereof, and proposed Order was served through the Court's ECF system on:

> Richard W. Luchs, Esq.
> William C. Casano, Esq.
> GREENSTEIN DELORME & LUCHS, PC
> 1620 L Street, N.W.
> Suite 900
> Washington, DC  20036-5605

_____/s/_____
Dale A. Cooter

15

**EXHIBIT A**

**Brookfield** Properties

# Memo

| | |
|---|---|
| To: | Tenants of 1225 Connecticut Avenue |
| From: | Karen Hunt, Property Manager |
| Re: | 1225 Renovation – Scheduling/Notification |

Date/Time:  July 20, 2007

As you know, Brookfield Properties will soon begin the renovation of 1225 Connecticut Avenue. To give you an understanding of the scope and timing of the work, we are providing a tentative schedule from our general contractor, Davis Construction. As with any construction project, these dates will be subject to change. Also, updated schedules and notices detailing the various project phases and any service interruptions will be provided in advance and coordinated directly with each affected tenant.

The parking garage will remain open during these renovations; however, some spaces will be impacted due to shoring during certain phases. We will continue to provide elevator service from the garage to the building's main lobby. Emergency egress exits will be maintained for the duration of the project for both retail spaces and they shall be clearly marked at all times.

The current schedule for construction is as follows:

A.    **INITIAL CONSTRUCTION SET-UP: July 23 – August 3, 2007**
- **Monday, July 23 – Friday, July 27, 2007** – Davis Construction will be adding partitions in the lobby area to separate constructions crews, offices and entrances from the rest of the main lobby and the tenants' areas.
- **Saturday, July 28, 2007** – The sidewalk tree planters will be demolished and completely removed. A crane will be placed on the N Street side of the building in order to install trash chutes for interior demolition.
- **Monday, July 30 – Friday August 3, 2007** – The metered parking and one lane of traffic will be blocked off on N Street to allow for the construction staging area.
- **Saturday, August 4, 2007** Scaffolding in the form of a covered walkway will be erected on 18th Street in front of the retail spaces and temporary signage will be installed so that the retail spaces remain clearly visible during construction. Entrances will remain unobstructed.

B.    **INTERIOR DEMOLITION: August 2007 – April 2008**
The first phase of construction will consist of interior demolition. Demolition will initially take place on the upper floors and then progress down the building.

C.    **EXTERIOR DEMOLITION: April 2008 – June 2008**

We will provide regular updates as construction progresses. For any questions throughout this process, please do not hesitate to call the management office at (202) 659-8349. Thank you.



# EXHIBIT B

## Organization Information

DCRA HOME
SERVICES
INFORMATION
ONLINE SERVICE REQUESTS

# Registered Organization Search
**STEP** 1 2 3 Your Search Results

Searched for: **davis construction**

We have found the following results for your query. Click on the radio button next to the organization you wish to view, then click the **Continue To** button below to view the organization's registration information and status.

| | Organization Name / State | Status | Date | File No. |
|---|---|---|---|---|
| ○ | DAVIS CONSTRUCTION, INC., MD | REVOKED | 4/23/1974 | 740983 |
| ○ | DAVIS CONSTRUCTION COMPANY, DC | REVOKED | 2/1/1980 | 800488 |
| ○ | DAVIS CONSTRUCTION SERVICES, LLC, VA | ACTIVE | 10/20/2000 | L06902 |

**Page 1**

| Return To Organization Homepage | Print Page | New Search | Continue To >> |
|---|---|---|---|

Review Organization Information

For more information, contact the Corporations Division at (202) 442-4432 or Ask the Director .




**MAYOR**
**Adrian M. Fenty**

## Organization Information

### Online Organization Registration
**Search Registered Organizations**

**Organization Details - Step** 1 2 3
To view another organization from the search, select the **Return to Search Results** button below. You may also **print** the organization details, or start a **new search**. Use the **Back to Main Page button** to continue the registration process.

| Organization | | Registered Agent |
|---|---|---|
| **Organization Name:** | DAVIS CONSTRUCTION SERVICES, LLC | CT CORPORATION SYSTEM 1015 15TH ST., NW; STE 1000- WASH, DC Washington, DC 20005 3437 |
| **State:** | VA | |
| **Status:** | ACTIVE | |
| **Initial Date of Registration:** | 10/20/2000 | |
| **File No.:** | L06902 | |
| **Organization Type:** | FOREIGN LIMITED LIABILITY COMPANY | |

| << Back to Main Page | < Return To Search Results | Print Results |
|---|---|---|
| New Search | | |

For more information, contact the Corporations Division at (202) 442-4432 or Ask the Director .

Government of the District of Columbia
Citywide Call Center : (202) 727-1000
TTY/TDD Directory

Telephone Directory by Topic | Agencies | DC Council | Search | Elected Officials

Feedback | Translation | Accessibility | Privacy & Security | Terms & Conditions

John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

**EXHIBIT C**





CONSTRUCTION ZONE
CONSTRUCTION PERSONNEL ONLY
NO TRESPASSING

DANGER
HARD HAT PROTECTION
AND EYES AND
SAFETY GLASSES
ARE MANDATORY
AT ALL TIMES

AVISO
PARA SU PROTECCION
EL USO DE CASCO Y
ANTEOJOS DE SEGURIDAD
SON OBLIGATORIOS
EN TODO MOMENTO



**EXHIBIT D**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INDEPENDENCE FEDERAL SAVINGS BANK,<br>    et al., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 07 2090 JDB |
| | ) | |
| v. | ) | |
| | ) | |
| 1225 CONNECTICUT CO. L.L.C.,<br>    et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Declaration of Larry C. Alexander, Jr. in Support**
**of Plaintiffs' Motion For Remand And for**
**<u>Costs and Attorneys Fees</u>**

I, Larry C. Alexander, Jr. depose and state as follows:

1.  I am over the age of 18 and am competent to testify to the matters contained herein, and testify that the following statements are true and correct and are based upon matters within my personal knowledge.

2.  My office address is 1229 Connecticut Avenue, N.W., Washington, D.C. 20036.  I am the Security Officer and Facilities Manager of Independence Federal Savings Bank (the "Bank").  The Bank is located inside the building whose address is 1225 Connecticut Avenue, N.W., Washington, D.C. (the "Building").

3. On Wednesday November 21, 2007 I photographed five "Davis Construction" signs located on-site at the Repositioning Project taking place at the Building.  A true and correct copy of these pictures is attached as Exhibit C to Plaintiffs' Motion For Remand and For Costs and Attorneys Fees.

I swear under the penalties of perjury of the District of Columbia that the facts set forth above are true and correct and made from my personal knowledge.

Executed under the penalties of perjury in the District of Columbia on the 26th day of November, 2007.


_Larry C. Alexander Jr._
Larry C. Alexander, Jr.

2

**EXHIBIT E**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INDEPENDENCE FEDERAL SAVINGS BANK | : : : |
| Plaintiff, | : : |
| v. | : Case No. 07-cv-1389 (JDB) |
| 1225 CONNECTICUT CO. LLC | : : |
| Defendant | : : |

### AFFIDAVIT OF JACKIE DUKE IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

I, JACKIE S. DUKE, under penalty of perjury, state as follows:

1.      I am over twenty one (21) years of age and make this Affidavit based on matters within my personal knowledge in support of the Opposition of Defendant 1225 Connecticut Co. LLC("1225") to Plaintiff's Application for Preliminary Injunctive Relief.

2.      I am the General Manager for Brookfield Properties Management LLC ("Brookfield") with an office address of 1250 Connecticut Avenue, N.W., Suite 500, Washington, D.C. 20036.

3.      On or about December 16, 1988, 1225's predecessor as the owner of the subject property, Pool 1225 Associates ("Pool"), as landlord, and Plaintiff, as tenant, entered into an Agreement of Lease (the "Lease") for a portion of the commercial property located 1225 Connecticut Avenue, N.W in Washington, D.C. (the "Property"), specifically, a portion of the main lobby and first basement (the "Premises")   A copy of the Lease, without Exhibits C and D to the Lease, is attached hereto as *Exhibit A*.

J20032\l

4.    The initial term under the Lease was for twelve (12) years, commencing on January 1, 1989 and ending on December 31, 2000. *Exhibit A.*

5.    Shortly before 1225 became the owner of the Property, on or about April 25, 2001, BRE/Connecticut L.L.C., a successor to Pool, and the Plaintiff executed a First Amendment to the Lease (the "First Amendment"), effective retroactively to January 1, 2001. A copy of the First Amendment is attached hereto as *Exhibit B.*

6.    The First Amendment, *inter alia,* extended the Plaintiff's right to possession of the Premises by an additional ten (10) years, or through December 31, 2010. *Exhibit B.*

7.    The Property, originally constructed in 1968, is a Class B office building. In order to replace certain systems (e.g., HVAC) that were approaching the end of their useful life, more successfully position the Property in the highly competitive District of Columbia commercial leasing market, and bring the Property to Class A standards, 1225 planned for extensive renovations and rehabilitation of the Property, including the exterior shell and mechanical system (specifically, the HVAC system) (the "Repositioning Project").

8.    The Repositioning Project involves the complete interior demolition of each floor of the Property beginning with the 8th floor down to the 2nd floor; lobby improvements; limited removal of asbestos containing materials throughout the building, but not within the Premises or the space occupied by Citibank; and the updating of selected systems in the Property.

9.    As noted, asbestos removal is limited to discrete areas of the building (floor tiles, boiler equipment, fire-rated doors, pipe insulation and roof materials) and does not involve any of the Premises. The removal will be performed by Ace Co., a licensed and certified asbestos removal company, selected by 1225 construction contractor, Davis Construction ("Davis"), which adheres to all laws and regulations attendant thereto  1225 has retained ATC Associates

2

to monitor the asbestos abatement program  A copy of the Asbestos Abatement plan is attached

hereto as *Exhibit C*.  The Asbestos Abatement plan specifies that all necessary safety precautions

will be taken during the asbestos removal portion of the Repositioning Project.  *Id.*

10.    In order to minimize the impact of the Repositioning Project on the tenants, 1225

elected to forego commencement until such time as the Property was nearly vacant.  The last

remaining office tenant was Ernst & Young, which had occupied approximately ninety-five

percent (95%) of the Property since the inception of their lease, on October 1, 1988, until it

vacated the Property on June 30, 2007

11.    At present, the Plaintiff and Citibank, adjacent ground floor retail tenants, are the

only remaining tenants of the Property.  The Property has not been re-rented in anticipation of

the performance of the Repositioning Project, and 1225 will suffer significant damages if the

same is delayed.

12.    In April of 2007, a representative of 1225 met with Plaintiff's representative to

discuss the Repositioning Project.  At this meeting, Plaintiff's representative expressed initial

concerns related to the Repositioning Project.  In response, 1225's representative requested a list

of specific issues that Plaintiff's representatives had in order for 1225 to address them

accordingly.

13.    In a letter dated May 11, 2007, 1225 announced the anticipated commencement

date of the Repositioning Project as July 1, 2007, and welcomed the commencement of a

dialogue with Plaintiff regarding any concerns they may have with the Repositioning Project.  A

copy of the May 11, 2007 letter is attached hereto as *Exhibit D*.

14.    On or about June 12, 2007, representatives from 1225 and the Plaintiff met to

discuss the Repositioning Project and the specific issues raised by Plaintiff.  1225 provided a

3

briefing as to the Repositioning Project overview, scope of work, estimated schedule and impact to the retail tenants. A copy of the meeting agenda is attached hereto as *Exhibit E* As the 1225 representatives attempted to address the specific concerns raised by the Plaintiff, the Plaintiff's representative indicated that, regardless of what steps 1225 took to address their concerns, they would not be adequate.

15.   On or about July 2, 2007, another meeting was held between 1225's representative and Plaintiff's representative regarding the Repositioning Project. During this meeting, the Plaintiff's representative asked the 1225 representative to provide the Plaintiff with a proposal to address the Plaintiff's concerns regarding the Repositioning Project. The 1225 representative agreed to consider possible resolutions and the parties agreed to reconvene at a later date to discuss.

16.   On or about July 9, 2007, Plaintiff's representative and 1225's representative had a follow-up telephone call during which 1225's representative attempted to discuss specific steps that 1225 was prepared to take to ensure that the Repositioning Project did not unreasonably interfere with Plaintiff's business operations. The Plaintiff's representative was dismissive of 1225's proposed resolution and pressed for even more accommodations. The 1225 representative solicited direction from Plaintiff's representative; however, Plaintiff's representative did not offer any alternative suggestions.

17.   On or about July 20, 2007, 1225, in a memo to the Plaintiff and Citibank, 1225 provided an estimated timeline for the Repositioning Project. A copy of the July 20, 2007 memorandum is attached hereto as *Exhibit F*.

18.   On July 12, 2007, 1225 secured a demolition permit for the Repositioning Project. A copy of the Demolition Permit is attached as *Exhibit G*. Davis built its on-site field office

4

between July 16 and July 18, 2007. The debris that was observed by Plaintiff in the dumpster was a by-product of this work and not work connected to the Repositioning Project. This debris has since been removed.

19.    1225 has obtained all required construction/demolition permits and public space permits (collectively, the "Permits"). Copies of the Permits are attached hereto as *Exhibit G* (the Construction/Demolition Permit) and *Exhibit H* (the Public Space Permit) With the exception of the removal of some finishes and some pre-cast concrete from the upper floor of the Property to make room for the trash chutes and Bobcats that will be performing the demolition (which did not require the issuance of the Permits), no work in connection with the Repositioning Project, including asbestos removal and/or remediation, commenced.

20.    With the exception of the removal of two (2) "stacks" of window cladding to make room for the demolition chutes, the remainder of the Property will be sealed. Once demolition occurs, temporary plywood covers will be placed on these stacks while demolition takes place. Attached as *Exhibit I* are photographs which are a true and accurate representation of the condition of the Property during the removal of the window cladding The location of the demolition chute is on the N Street side of the Property, which is around the corner from the main entrance to the Premises.

21    When the exterior recladding begins, the entire skin (including windows) of the Property will be removed. To prevent intrusion of water into the Premises, and Citibank's space, 1225 will be "roofing" the slab above the Premise. Davis will install standard roofing membrane over the Premises (and the Citibank space) which will be tacked down, instead of completely adhered since it is temporary in use and does not need complete protection from the elements.

5

All penetrations of the membrane will be sealed and any water will be routed to Property's

roof/storm drain system. This will remain in place until the Property is made water tight.

22.    Article 16.02 of the Lease, which entitles 1225 to undertake work at the Property

provided certain conditions are met, states in its entirety:

> Landlord reserves the right, without the same constituting an actual
> or constructive eviction and without incurring liability to Tenant
> therefor, to change the arrangement and/or location of public
> entrances, passageways, doors, doorways, corridors, elevators,
> stairways, toilets and other public parts of the Building; provided,
> however, that the demised premises shall be visible from the street,
> public access on the street level directly into the demised premises
> shall not be cut off, access to the Building shall not be cut off, and
> that there shall be no unreasonable obstruction of access to the
> demised premises or unreasonable interference with the use or
> enjoyment thereof.

*See Exhibit A.*

23.    In order to satisfy its obligations under the Lease, 1225 has undertaken to do the

following:

A.    The 18th Street side of the Property will have a "tube and pipe"
scaffolding approximately ten (10) feet high (prior to demolition of the
exterior of the Property, the initial three (3) feet from the street will also
contain wood panels to provide protection from falling objects). This type
of scaffolding was selected primarily to ensure maximum visibility of the
Premises and Property during construction. Attached as *Exhibit J* are
photographs which are a true and accurate representation of the Property
with the "tube and pipe" scaffolding, covered and lit walkway and
temporary signage in front of the Premises.

B.    Temporary signage has been affixed to the scaffolding identifying the
Plaintiff and making it clear to the public that the Plaintiff is open for
business during the construction activities at the Property. *See, Exhibit J.*
In fact, the temporary signage is more visible than Plaintiff's original
signage. Contrast *Exhibit J* with *Exhibit K*, photographs which are a true
and accurate depiction of the Premises before the installation of the
scaffolding.

C.    The N Street side of the Property will be bounded by a jersey wall and
chain link fence surrounding the "staging area." The contractor has been
instructed to not install any opaque mesh on the fencing to ensure

6

320032\1

visibility of the Premises from N Street. The contractor agreed to locate the "staging area" further east and away from the retail portion of the Premises, as well as relocating the two (2) dumpsters and trash chutes to not be in front of the Property. Temporary signage for the N Street side of the Premises and Property will be affixed to the chain link fence. Attached as *Exhibit L* are photographs which are a true and accurate representation of the condition of the N Street side of Property and Premises.

D.    All entrance and exit points for the Premises will be maintained. There will be covered and lit walkways leading to and from the Premises and the Property. *See, Exhibit J.* On the N Street side, a pedestrian walkway will be maintained under the existing covered "arcade" area. *Id.* During lobby renovations, if Independence requires access into the Premises lobby area, 1225 will provide escorted access through the work area. Temporary partitions will be installed in the lobby area to separate pedestrians from the work area and construction activities

E.    1225 will be scheduling service interruptions after normal business hours so as to minimize or avoid inconvenience to the tenants of the Property, including the Plaintiff.

F.    The parking garage will remain available for use. 1225 is taking steps to have contractors maintain the construction site in a tidy fashion so as to not negatively impact the appearance of the Property.

G.    1225 has a "day porter" available to respond should there be dust or water infiltration. The day porter will also be available to remove trash from the retail tenants' spaces to the loading dock dumpster.

H.    All utilities and fire/life safety systems will remain operational for the first floor.

I.    The Property's security access control will remain in operation throughout the renovation.

J.    A temporary chiller will be provided for cooling when the main system for the Property is undergoing modification.

K.    A new retail boiler will be in place for the retail heating load.

L.    Roofing will be installed on the 2nd floor to reduce the risk of leakage into the retail space

M.    Temporary toilet facilities have been relocated out of the staging area on N Street.

N.    Davis has been requested to focus on keeping the construction site tidy.

320032\1

O.    The outside air filters will be reviewed regularly and replaced as required.

24    In a letter dated July 23, 2007, 1225, through counsel, informed Plaintiff, through counsel, of the steps 1225 was taking to minimize inconvenience to the Plaintiff during the Repositioning Project. A copy of the letter is attached as *Exhibit M.*

25.    Paragraph 11 of the First Amendment requires 1225 to provide Plaintiff with two (2) reserved parking spaces in the over 300 space parking garage located in the Property. *See, Exhibit B.* The parking garage will remain open during the construction project, and the Plaintiff will continue to have the two (2) reserved parking spaces as provided in the First Amendment.

26.    The parking garage will also be available for customer and general public use during the construction project  In fact, with the departure of Ernst & Young, the garage now has a greater capacity to accommodate transient day parkers, including Plaintiff's customers.

27.    The Lease does not require 1225 to provide air conditioning to Plaintiff, but rather only a supply of "chilled water " *See, Exhibit A, para 21 01*  Chilled water is provided to the Plaintiff until 6:00 p.m. each business day. During the period of time from March through June when Ernst & Young was in the process of vacating the Property, Ernst & Young specially requested extended hours, for which it paid 1225, for air conditioning for the comfort and convenience of their moving crews. The following represents the number of days 1225 provided the additional hour (6:00 p.m. to 7:00 p.m.) of chilled water service in the Property to accommodate Ernst & Young's move-out:

> 21 Days in March, 2007
> 22 Days in April, 2007
> 17 Days in May, 2007
> 22 Days in June, 2007

28.    As a result of this extended hour of chiller service, both the Plaintiff and Citibank benefited as they received chilled water beyond the 6:00 p.m. cut-off time. 1225 has made no

8

320032\1

changes to the chilled water supply as it existed before the special circumstances of Ernst & Young's move, nor after such move was completed. The chilled water supply to the Premises is as it has been throughout the balance of Plaintiff's Lease. Coincidentally, effective on May 29, 2007, the Plaintiff extended its business hours for one (1) additional hour (until 5:00 p.m. instead of 4:00 p.m. on Monday through Friday).

29.     Both Citibank and the Plaintiff draw from the same chilled water supply. To date, 1225 has received no complaints or other communications from Citibank regarding problems with the air conditioning, chilled water supply or temperature in their leased space.

30.     The Plaintiff will have continued access to the alleyway and dumpsters located therein, although the route traveled to reach the dumpster may vary, and the Plaintiff's trash removal will not be adversely impacted by the Repositioning Project. The dumpster is kept under lock and key to prevent unauthorized use by non-tenants, and the Plaintiff has been provided with multiple copies of the key to the dumpster locks.

31.     Mindful of the potential of a varying route, and in a further effort to minimize inconvenience to Plaintiff during the Repositioning Project, in an email dated Friday, August 10, 2007, 1225 offered the Plaintiff an alternative for trash removal. A copy of the August 10, 2007 email is attached as *Exhibit N*. Under this alternative scenario, the Plaintiff would be permitted to place its trash in a rolling container located near the N Street emergency egress from the Premises, whereupon 1225's representatives would transport the same to the dumpster at the Property *Id*.

32.     Citibank has registered no complaints with 1225 with respect to any facet of the Repositioning Project. To the contrary, Citibank has been very cooperative and understanding of the situation

9

320032\J

33.    Plaintiff has not brought to 1225's attention even one instance of a customer

discontinuing doing business with Plaintiff due to the presence of scaffolding or any perceived

traffic or parking disruptions.

34    Contrary to Plaintiff's implication that it currently is a minority owned institution,

its current majority ownership is held by persons not of a minority background.

35.    Should the injunction requested by Plaintiff be imposed, 1225 would be severely

damaged  Such action will have the following consequences:

A.    *Lost rental income from the office portion of the Property.* Ernst &
Young, who occupied approximately Two Hundred Thousand (200,000)
square feet was paying Thirty-Eight Dollars ($38.00) per rentable square
foot.  It is expected that after the completion of the Repositioning Project
that the asking market rate will be approximately Sixty-Five Dollars
($65.00) per rentable square foot.  Therefore, each month of delay could
cost 1225 between Six Hundred Thirty-Three Thousand Dollars
($633,000 00) and One Million Eighty-Three Thousand Three Hundred
Thirty-Three Dollars ($1,083,333 00) in lost rental revenue.

B.    *Construction Delay Costs.* Delay costs from construction contract (e g ,
increases in material costs and increases in contractor's general overhead
costs).

Jackie S. Duke

10

320032\1

# EXHIBIT H

# TO AFFIDAVIT

**District Department of Transportation**
Public Space Management Administration
941 North Capitol Street N.E. room 2300
Washington D.C 20002

Tel. (202)442-4670    Fax (202)442-4867    Inspections: (202) 535-2347

# d.

Date: 8/8/2007

**PERMIT NO. PA 29092**

Address of work:    1225 CONNECTICUT AVE NW

Ward: 2    Lot: 0052    Square: 0159

Permission is Hereby granted to:    DAVIS CONSTRUCTION

| | |
|---|---|
| Deposit Number:S    03440 | Permit Fee:    $114.00 |
| Inspection Number:W | Deposit Amount:    $105,740.00 |
| Meter Fee Number:M    01596 | Inspection Amount:    $0.00 |
| | Meter Fee Amount:    $31,567.50 |

Description:    Occupancy: Staging Area(s), Cover Walk-way(s), Temp. Parking/Meter(s), Crane, AS PER
APPROVED TCP

**Permission is granted to the entity named above to perform the work described herein
at the address shown above in strict accordance with all conditions stated on all pages
of this permit as well as on the application submitted.**

Approved Trafic Control Plan must be on site at all times.
Only commercial vehicles directly needed for construction are permitted to be parked in the area defined by this
permit.
No work is permitted before 7:00am or after 7:00pm Monday through Saturday No work is permitted on Sunday
SCOPE OF WORK :
BUILDING RENOVATION / OCCUPANCY PER TCP
All work must comply with all District regulations and statutes.Violation of any District regulations or statute may
result in the revocation of this permit.
No crossing of sidewalk with trucks.
No sales permitted in public space
This permit must be on site at all times.
This permit is revocable at any time at the discretion of MPD and DDOT.
No blocking of alley with trucks or construction equipment.
No work in public space permitted during official DC government holidays.
For return of deposits please call the Permit Office at (702) 535-2347 to schedule an inspection.
Permit holder responsible for obtaining any additional permits required by statute or regulation including DDOE and
DCRA.
Permit holder is responsible for all damage to public space as a result of work done under this permit.
New TCP is required every six months.
Prior to street and alley closures permittee must contact local fire station.

Permit Effective:    8/14/2007

Permit Expires:    2/14/2008

*Eben Metzger*
Eben Metzger

Civil Engineering Technician

Emeka Moneme

Director

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS BANK, )
    et al.,                       )
                            )
    Plaintiffs,             )  C.A. No. 07 2090 JDB
                            )
    v.                       )
                            )
1225 CONNECTICUT CO. L.L.C.,   )
    et al.,                       )
                            )
                            )
    Defendants.             )
_____)

## ORDER

UPON CONSIDERATION of the Plaintiffs' Motion for Remand and for Costs and Attorneys Fees, the Memorandum of Points and Authorities in support thereof, any response of Defendants thereto and any hearing thereon, it is this _____ day of _____, 200__, hereby

ORDERED that the Plaintiffs' Motion be, and it hereby is, GRANTED and it is further

ORDERED that this case is remanded back to the District of Columbia Superior Court and it is further

ORDERED that Defendants shall pay Plaintiffs their reasonable costs and attorneys fees resulting from the removal to this Court and it is further

ORDERED that the Plaintiffs shall file a statement of their fees and costs by _____, and that Defendants shall file any response thereto by _____.

_____
John D. Bates, Judge
United States District Court

2