IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS
BANK, *et al.*

       *Plaintiffs*,

v.

1225 CONNECTICUT CO. LLC, *et al.*

       *Defendants*.

Civil Action No. 07-2090 (JDB)

### DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES OPPOSING PLAINTIFFS' MOTION TO REMAND AND FOR COSTS AND ATTORNEYS FEES

Defendants 1225 Connecticut Co., LLC ("1225") and Davis Construction Services, LLC ("DCS"), by their undersigned counsel, hereby submit the instant memorandum opposing Plaintiffs' motion to remand and for costs and attorneys fees.

### FACTS

This is a case involving a dispute over a renovation project ("Repositioning Project") at an office building located at 1225 Connecticut Avenue, N.W., and the alleged impact that construction has on the operations of the tenant, Plaintiff Independence Bank ("IFSB"), a federally chartered savings bank with its principal place of business in the District of Columbia. Complaint at paras. 2, 5, 12, 14, 17-54. Plaintiff IFSB is a tenant of Defendant 1225 (a Delaware limited liability company) with respect to space on the ground floor of 1225 Connecticut Avenue, N.W., Washington, DC and its lease terms extends through December 31, 2010. Complaint at paras. 6, 12 and 14. 1225 is currently in the process of renovating all floors above

the ground floor as part of the Repositioning Project. Stanley W. Parsons, a Virginia resident, is not a tenant, but rather is an employee of Defendant IFSB. Complaint at para. 3. DCS is mistakenly alleged to be the general contractor on the project. See infra.

## LITIGATION HISTORY

On July 31, 2007, Plaintiff Independence Federal Savings Bank ("IFSB") filed a complaint in the United States District Court for the District of Columbia, Civil Action No. 07-1389 ("Federal Suit"). In its complaint, which was amended on August 10, 2007, IFSB complained about the Repositioning Project and the impact such work allegedly was having on IFSB's operations. Specifically, IFSB alleged that there were seven ways in which the project violated the terms of the Lease and/or the covenant of quiet enjoyment: 1) destruction of all but the floors and supporting beams of the building; 2) removal of asbestos while tenants remain in the building; 3) dust-debris, noise and vibration from construction; 4) failure to provide air conditioning; 5) the site is an ongoing eyesore not suitable for a professional business; 6) the temporary replacement of IFSB's windows with plastic sheets will prevent the back from implementing basic security measures; and 7) IFSB is constructively evicted from the lobby for the duration of the project.

At the time the Federal Suit was filed, IFSB also filed a motion for preliminary injunction which motion was also amended. The motion sought an order prohibiting 1225, until December 31, 2010, from further renovating the building even though seven of eight floors were vacant and some of those floors had been partially demolished. After a hearing, this Court denied the motion for preliminary injunction on September 11, 2007. See Transcript of Oral Ruling attached as Exhibit A. In making that ruling, this Court found that: (a) evidence established that the planned asbestos removal will be properly and safely conducted with minimal risk to IFSB

employees and customers.  *Id. at 14*; (b) IFSB's concerns regarding hazardous conditions, bank security, fire code violations, fire hazards, and safety code violations were without support (*Id.*); (c) the scaffolding installation was consistent with the construction permit and will not prevent access to IFSB's premises, *Id.*; (d) 1225 provided clear and adequate temporary signs and is making reasonable efforts to address IFSB's trash concerns and to avoid any unnecessary or overly disruptive closure of entrances, *Id.*; (e) no likely carbon monoxide from interior equipment was likely to penetrate IFSB's premises, *Id.*; (f) the record did not establish any serious rodent infestation, *Id. at 14-15*; (g) the record established 1225 provided adequate chilled water for air conditioning as required by the Lease, *Id. at 16*; and (h) that 1225 made reasonable efforts to avoid and minimize the disruption and inconvenience the Repositioning Project will cause to IFSB.  *Id. at 19*.  Thereafter, on September 24, 2007, IFSB filed a stipulation of voluntary dismissal without prejudice.

On or about October 23, 2007, IFSB filed suit in the Superior Court of the District of Columbia the instant suit ("Local Suit") concerning the same renovation work at 1225 Connecticut Avenue.  The Local Suit complaint is largely a reiteration of the federal complaint. However, IFSB added parties and claims in the Local Suit, no doubt in an effort to thwart removal to federal court.  With respect to the parties, the complaint in the Local Suit names as a new plaintiff, Stanley W. Parsons, who, as noted, is described in the complaint as an IFSB employee since 2001 at the 1225 Connecticut Avenue location, and the current Vice-President and Chief Information Officer.  Complaint at para. 3.  The complaint adds a new defendant, Davis Construction Services, LLC ("DCS"), a Virginia limited liability company, which the Complaint mistakenly identifies as the construction contractor of the Repositioning Project. Compl. at paras. 68, 78.  However, DCS has absolutely nothing to do with the Repositioning

3

Project.  See Notice of Removal, Exhibit D thereto, Affidavit of Neil Moodhe, and Exhibit E thereto, Affidavit of Simon Carney.  See also Exhibit B hereto, Affidavit of Edward Green, III In Opposition To Plaintiffs' Motion to Remand at para. 5.

Because IFSB littered its complaint in the Local Suit with parties improperly joined and with claims that simply fail to state a cause of action upon which relief can be granted, Defendants filed a Notice of Removal on November 16, 2007.  In that Notice, Defendants stated as the grounds for removal that Plaintiff Parsons and Defendant DCS were improperly and/or fraudulently joined as parties.  With respect to DCS, the Notice of Removal specifically cites that DCS has nothing to do with the Repositioning Project.  Notice of Removal at paras. 7, 10.  With respect to Plaintiff Parsons, the Notice of Removal specifies that his joinder is fraudulent because he cannot state a cause of action for breach of contract under a third party beneficiary theory, that there is no implied covenant of quiet enjoyment in the face of an express covenant, that in any event, such covenant runs only between landlords and tenants, not invitees of tenants such as Parsons, and that Parsons has no standing to maintain a cause of action in nuisance because, _inter alia_, he has no possessory right.  Notice of Removal at para. 11.  Plaintiffs' motion to remand does nothing to alter these conclusions.

## ARGUMENT

### I.    STANDARD OF REVIEW

Defendants do not dispute that this Court construes its jurisdiction narrowly, that Defendants bear the burden to prove that removal was proper, and that with respect to Defendants' claim of fraudulent joinder, Defendants must establish that no possibility exists that a plaintiff can establish liability of the non-diverse defendants at issue.  See, generally,

_Bhagwanani v. Howard University_, 355 F. Supp. 2d 294 (D.D.C. 2005); _Brown v. Brown & Williamson Tobacco Corp._, 26 F. Supp. 2d 74 (D.D.C. 1998).

It is also indisputable that to the extent that Defendants establish that Plaintiffs' claims against Defendant DCS and that Plaintiff Parson's claims in toto fail to state a cause of action upon which relief can be granted and should be dismissed as a matter of law, the presence of such fraudulently joined claims and parties should be disregarded when assessing the propriety of removal under diversity jurisdiction. _See e.g._, _Hart v. Bayer Corp._, 199 F.3d 239 (5th Cir. 2000) (To prove allegations of fraudulent joinder, removing party must demonstrate that there is no possibility that plaintiff would be able to establish a cause of action against in-state defendant in state court.); _Newman v. Motorola, Inc._, 125 F. Supp. 2d 717 (D. Md. 2000) (Fraudulent joinder was demonstrated when the record showed the plaintiff had "no glimmer of hope" of succeeding with any of the claims made against the non-diverse defendant.); _Peters v. Metro Life Ins. Co._, 164 F. Supp. 2d 830 (S.D. Miss. 2001) (Defendant can demonstrate fraudulent joinder by providing clear and convincing evidence that plaintiffs could establish no cause of action against them under state law.); _Wright v. American General Life & Accid. Ins. Co._, 136 F. Supp. 2d 1207, 1210-11 (M.D. Ala. 2001) (Filing a frivolous or illegitimate claim against a non-diverse defendant solely to prevent removal is fraudulent joinder; such claims include those with no possibility of success, claims pleaded with fraudulent facts, and claims that lack a connection with the non-diverse defendant.); _Palmquist v. Conseco Med. Ins. Co._, 128 F. Supp. 2d 618, 621 (D. S.D. 2000) (A defendant is fraudulently joined if no cause of action lies against it.); _Palmer v. Wal-Mart Stores, Inc._, 65 F. Supp. 2d 564 (S.D. Tex. 1999) (Plaintiff had  no possibility of recovery under Texas law against defendant, thus joinder was fraudulent.); _Arzehgar v. Dixon_, 150 F.R.D. 92, 94 (S.D. Tex. 1993) (If nondiverse defendants are joined fraudulently, their

presence should be disregarded when assessing propriety of removal under diversity jurisdiction).[1]

A review of the facts and law applicable to the instant case make readily apparent that all claims against DCS and all claims of Plaintiff Parsons fail to state a cause of action and are subject to dismissal. Accordingly, all such claims and parties have been fraudulently joined and must be disregarded when determining diversity jurisdiction. Without said claims and parties, this case reverts to the case this Court has already exercised jurisdiction over, namely Civil Action 07-1389.

## II. STANDARD REGARDING DISMISSAL OF COMPLAINT

Dismissal of the parties and claims is proper where there is little doubt that Plaintiff can prove no set of facts in support of a claim which would entitle him or her to relief. *Duncan v. Children's National Medical Center*, 702 A.2d 207, 210 (1997), cert. denied, 525 U.S. 912 (1998). In this exercise, the Court must treat the complaint's well pled factual allegations as true and draw all reasonable inferences there from in the plaintiff's favor. *Holyland Foundation for Relief and Development v. Ashcroft*, 357 U.S. App. D.C. 35, 333 F.3d 156, 165 (D.C. Cir. 2003); *Mancuso v. Santucci*, 69 A.2d 274 (D.C. Mun. App. 1947). However, the Court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions as factual allegations. *Browning v. Clifton*, 352 U.S. App. D.C. 4, 292 F.3d 235, 242 (D.C. Cir. 2002); *Warren v. District of Columbia*, 359 U.S. App. D.C. 179, 353 F.3d 36, 39 (D.C. Cir. 2004); *Donald v. Orfila*, 618 F.Supp. 645 (D.D.C. 1985), *aff'd*, 788 F.2d 36 (D.C. Cir. 1986). The

---

[1]    Moreover, it is not required that the state court determine that the claims at issue fail to state a cause of action before the case is removed. *See*, *e.g.*, *Newman v. Brent, 1998 U.S. Dist. LEXIS 10476 (D.D.C 1998)* (Defendants could have filed a Notice of Removal early on, even before there was a jurisdictional basis for diversity, and stated fraudulent joinder as grounds for removal).

District of Columbia Court of Appeals has repeatedly held that dismissal with prejudice is

appropriate where plaintiff can prove no set of facts in support of its claims which would entitle

plaintiff to relief.  *See, e.g., Schiff v. American Association of Retired Persons,* 697 A.2d 1193

*(D.C. 1997)*; *Cauman v. George Washington Univ., 630 A.2d 1104, 1105 (D.C. 1993).*

III.    DEFENDANT DCS WAS FRAUDULENTLY JOINED AND SHOULD BE DISMISSED AS A
        DEFENDANT AS TO COUNTS III, IV AND V BECAUSE IT HAS ABSOLUTELY NOTHING TO
        DO WITH THE REPOSITIONING PROJECT.

        The Complaint, Para. 68, alleges "On information and belief, 1225 LLC and Davis have

entered into a contract pursuant to which Davis is acting as the general contractor for the

Repositioning Project[.]"  All of the various claims against DCS stem from the premise that DCS

is the general contractor.  See, *e.g.*, Complaint at paras. 68, 78.  In reality, DCS has nothing to do

with the Repositioning Project.  See Affidavit of Neil D. Moodhe attached as Exhibit D to Notice

of Removal; Affidavit of Simon Carney attached as Exhibit E to Notice of Removal.  Exhibit B

hereto, at para. 5; Exhibit C hereto, Affidavit of Simon Carney In Opposition To Motion For

Remand, at para. 5.

        Plaintiffs' counter to this fact is that they had a reasonable basis to conclude that it was

DCS, rather than any other entity, that was the general contractor.  In this regard, Plaintiffs cite

that construction signs at the site all read "Davis Construction."  Plaintiffs also cite the

construction permit which was issued to "Davis Construction" and 1225's referral to the

contractor as "Davis Construction."  See Plaintiffs' Memorandum at 10-12.  In none of the

instances they cite, however, is the contractor referred to as Davis Construction Services, LLC."

Moreover, Plaintiffs also rely on the results of their search of District of Columbia corporate

records using the search term "Davis Construction."  Id.

In point of fact, the general contractor is James G. Davis Construction Corporation and such fact had been clearly provided to IFSB as part of the original federal litigation.  In this regard, as part of 1225's Response to Plaintiff IFSB's Reply Concerning Amended Application for Preliminary Injunctive Relief (08/31/07), 1225 submitted as Exhibit D thereto the Affidavit of Edward Green, III who, *inter alia* stated as follows:

> I am Senior Project Manager for James G. Davis Construction Corporation ("Davis"), working out of Davis' office located at 1430 Spring Hill Road, McLean, Virginia.  Davis is the general contractor hired by Brookfield Properties Management LLC ("Brookfield") in connection with the renovation project (the "Renovation Project") occurring at 1225 Connecticut Avenue, N.W., Washington, DC 20036 (the "Property").

*Id*. at para. 2.  For the convenience of the Court, a copy of this affidavit is attached hereto as Exhibit D.  Thus, long before Plaintiffs filed their Complaint in Superior Court, IFSB had sworn evidence from the general contractor itself.  James G. Davis Construction Corporation is frequently referred to by the shorthand name of "Davis Construction."  Or "Davis."  Exhibit B at para. 5, Exhibit C at para. 4.[2]  Defendant Davis Construction Services LLC, while a corporate subsidiary of James G. Davis Construction Corporation, is a completely different and separate entity.  Exhibit B at para. 6.  When Plaintiffs performed their search of District of Columbia corporate records, had they searched the name that was provided to them as the contractor, they would have discovered that James G. Davis Construction Corporation is indeed registered to do business in the District of Columbia.  See Exhibit E.

The fact of the matter is that Defendant DCS has absolutely nothing to do with the Repositioning Project and that IFSB was provided with specific sworn information on the

---

[2]    Conversely, DCS is referred to as "Davis Services."  Exhibit B at para. 6.

identity of the general contractor, yet apparently ignored such and instead sued the wrong entity. There is no "ambiguity" as Plaintiff would like to characterize it. See Plaintiffs' Memorandum 11. Rather, what we have is an error made by Plaintiffs which does not serve as a basis to maintain any causes of action against DCS. When Plaintiffs ignored the information given to IFSB concerning the identity of the general contractor, they did so at their folly.

As noted, this Court need not accept as true any allegations of the Complaint which are not well pled or are inferences unsupported by facts. Plaintiffs allegations against DCS based on "information and belief" are examples of such allegations not entitled to an inference of veracity. There is no basis for liability against DCS, and Plaintiffs, as a matter of law, cannot state a cause of action against DCS. Accordingly, Counts III and IV as they apply to DCS and Count V in its entirely since DCS is the only defendant to that Count, must be dismissed with prejudice and certainly must be disregarded when determining diversity jurisdiction for removal.

IV.    THERE IS NO BASIS IN LAW SUPPORTING PLAINTIFF PARSONS' CLAIM FOR BREACH OF CONTRACT AS A THIRD PARTY BENEFICIARY AND COUNT II SHOULD BE DISMISSED.

In Count II of the Complaint, Parsons alleges that 1225 is liable to him – as a third party beneficiary of the lease between 1225 and IFSB – for breach of contract.   See, Complaint at 62. In essence, Parsons is asking this Court to find that every employee is an intended beneficiary of the lease between its employer (the tenant) and the landlord.  Not only is such a result unsupported by the governing law, such a result would have a chilling effect on landlord-tenant relations.  Under the current law, as Parsons is not an intended beneficiary of the lease, this count must fail as a matter of law.

The general rule regarding third party beneficiaries, followed in the District of Columbia, is that a third person may, under their own name, enforce a promise made for their benefit even if

said person is a total stranger to both the contract and the consideration.  *See, Western Union Telegraph Co. v. Massman Construction Co., 402 A.2d 1275 (D.C. 1979); Aetna Cas. & Sur. Co. v. Kemp Smith Co., 208 A.2d 737 (D.C. 1965); see also, Hall v. Gardiner, 75 U.S. App. D.C. 226, 126 F.2d 227 (D.C. Cir. 1942); see also, Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303 (1927).*  The determining factor for whether a third party may enforce a contract as a third party-beneficiary is the intent of the parties to the contract, and specifically, whether the parties intended the third person to benefit from the contract.  *See, Fields v. Tillerson, 726 A.2d 670 (D.C. 1999); Johnson v. Atlantic Masonry Co., 693 A.2d 1117, 1122 (D.C. 1997)* (a third party to a contract "may sue to enforce its provisions if the contracting parties **intend** the third party to benefit directly thereunder."(emphasis added)); *Safer v. Perper, 186 U.S. App. D.C. 256, 569 F.2d 87 (D.C. Cir. 1977); Hamilton & Spiegel, Inc. v. Board of Ed. of Montgomery County, 195 A.2d 710 (Md. 1963)* (The contract must have been intended for the benefit of the third person in order to entitle such person to enforce the same.).

Absent such intent for the third party to benefit from the contract, that person is nothing more than an incidental beneficiary with no enforcement rights.  *See, Port Chester Elec. Const. Co. v. Atlas, 357 N.E.2d 983 (N.Y. 1976).*[3]  The question of whether a contract was intended to benefit a third party is an issue of contract construction.  A court will examine the contract as a whole to determine whether the third party beneficiary was intended or incidental.  *Western Union Telegraph Co., supra, 402 A.2d at 1277.*

---

[3]    An incidental beneficiary benefits from the contract of another but such benefit was **not the intent** of the contracting parties.  *Schwartz v. Brown, 64 A.2d 298 (D.C. 1949); Implement Service, Inc. v. Tecumseh Products Co., 726 F.Supp. 1171 (S.D. Ind. 1989).*

An examination of the Lease demonstrates that neither Parsons, nor any employee of IFSB was an intended beneficiary of the lease.  First, there is no mention of the term "employee(s)" or the name Parson in the Lease.  While this is not dispositive on the issue of intended third party beneficiaries, it does require Parsons to point to specific language in the Lease that demonstrates that same was made for his benefit.  Second, the Lease defines the Tenant as "Independence Federal Savings Bank" and not IFSB and any and all of its employees.  See, Exhibit A to Complaint, Lease at p. 1 (Defining "Tenant" as "INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation….).  Clearly, the parties to the Lease, 1225 and IFSB, were negotiating the obligations that each had to each other, and not to IFSB's employees.  Finally, an examination of Paragraph 41.10 of the Lease further supports the contention that Parsons is nothing more than an incidental beneficiary of the Lease.

Paragraph 41.10 provides:

> The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of the Landlord and Tenant and their respective heirs, distributes, executors, administrators, successors, and except as otherwise provided in this Lease, their assigns.

See, Exhibit A to Complaint, Lease at p. 44, para. 41.10.

This paragraph clearly defines the intended beneficiaries of the Lease – namely 1225 and IFSB.  Had it been the parties' intention to have the Lease provisions "inure to the benefit" of IFSB's employees, the same would have been specifically provided in this provision.

In the case of *Castelvetro v. Mills, 1994 Conn. Super. LEXIS 270 (Ct. Super. Ct. 1994)*[4], a Connecticut court dismissed counts pertaining to the alleged third party beneficiaries.  In

---

[4]    A copy of *Castelvetro v. Mills* is attached for the Court's convenience as Exhibit F.

*Castelvetro*, the plaintiffs alleged that their position as employees of the tenant was enough to confer third party beneficiary status upon them, and they asserted the same. *Id. at 5.* The *Castelvetro* complaint - as does the Complaint in the instant matter - failed to provide factual support for this conclusion, and furthermore, the plaintiffs failed to allege the lease put forth the requisite intent to benefit the employees. On this basis, the *Castelvetro* Court found that the plaintiffs were not third party beneficiaries to the lease between their employer and the landlord.

In the instant matter, Parsons is nothing more than an incidental beneficiary who is not permitted to sue to enforce the Lease. Parsons has failed to carry his burden of demonstrating that 1225's primary objective in entering the Lease with IFSB was for the benefit of IFSB's employees. There is no support in the complaint that Parsons, or any other IFSB employee for that matter, was the real promisee under the Lease. Accordingly, Count II fails to state a claim upon which relief may be granted.

V.    COUNT III ALLEGING A BREACH OF THE IMPLIED COVENANT OF QUIET ENJOYMENT SHOULD BE DISMISSED BECAUSE THERE IS NO IMPLIED COVENANT WHEN AN EXPRESS COVENANT IS PRESENT, AND ANY SUCH COVENANT, EXPRESS OR IMPLIED, DOES NOT RUN IN FAVOR OF NON-TENANTS NOR AGAINST NON-LANDLORDS.

In Count III of the Complaint, both Plaintiffs allege a violation of the implied covenant of quiet enjoyment against both Defendants. There are several grounds upon which this Count fails to state a cause of action upon which relief can be granted.

A.    THERE IS NO IMPLIED COVENANT OF QUIET ENJOYMENT WHERE THE LEASE IN QUESTION PROVIDES AN EXPRESS COVENANT OF QUIET ENJOYMENT.

The Lease, specifically Section 20.01, has an express provision regarding quiet enjoyment. That section of the Lease provides as follows:

QUIET ENJOYMENT

20.01    Landlord covenants and agrees that, subject to the terms
and provisions of this Lease, if, and for so long as, Tenant keeps

12

and performs every covenant, agreement, term, provision and condition herein contained on behalf of Tenant to be kept or performed, then Tenant's rights under this Lease shall not be cut off or ended before the expiration of the term of this Lease, subject however, to the terms of this Lease including, without limitation, the provision of Article XXV hereof.

When there is an express covenant of quiet enjoyment, such governs and abrogates any implied covenant on the same subject.  See _Myers v. Kayhoe_, 892 A.2d 520, 527 _(Md. 2006)_ (An express term negates any implied inconsistent term relating to the same aspect of the contracts); _IGEN Intern, Inc. v. Roche Diagnostics GmbH_, 335 F.3d 303, 314 (4th Cir. 2003); _District Realty Title Ins. Corp. v. Jack Spencer Real Estate, Inc.,_ 373 A.2d 952, 955 (Md. 1977) (Implied terms of a contract are utilized only in order to supply the place of a missing express term); _Goldman v. Alkek_, 1993 Tex. App. LEXIS 465, 5 (Tex. App. 1993) (Where lease contains an express covenant of quiet enjoyment, the express clause governs and abrogates any implied warranty of quiet enjoyment).  In the instant case, given the fact that there is an express quiet enjoyment provision in the Lease, such controls the issue of quiet enjoyment in the instant case, therefore mandating dismissal of Count III.  Moreover, the remedy of IFSB for any disturbances in its enjoyment is not by way of a separate cause of action for breach of the implied covenant of quiet enjoyment, but rather is part of a claim for breach of the Lease.  Indeed, IFSB already alleges in Count I, a breach of the express provision regarding quiet enjoyment.  Complaint at para. 58.

  B.      THERE IS NO COVENANT OF QUIET ENJOYMENT THAT RUNS AGAINST DEFENDANT DCS OR IN FAVOR OF PLAINTIFF STANLEY PARSONS.  ANY COVENANT OF QUIET ENJOYMENT RUNS ONLY BETWEEN THE TENANT AND THE LANDLORD.

As noted, Count III of the Complaint purports to state a claim by both Plaintiffs, _i.e._, both IFSB and Parsons, against both Defendants, _i.e._, Defendant 1225 and Defendant DCS. Parsons, however, is not the tenant, but rather is an employee of tenant IFSB.  The covenant of

quiet enjoyment does not run in favor of employees or other invitees of the tenant, nor does it run against any agents of the landlord. Instead, the covenant of quiet enjoyment runs strictly between the tenant and the landlord or those claiming paramount title through the landlord.

The District of Columbia Court of Appeals has made it clear that the covenant of quiet enjoyment goes only to possession, does not extend to invitees, and is not broken unless there is an eviction from, or some actual disturbance in, the possession by the landlord or by some third person under paramount title. *See*, *e.g.*, *Hyde v. Brandler*, 118 A.2d 398, 399-400 *(D.C. 1955)*; See also *Young v. District of Columbia*, 752 A.2d 138, 142 (D.C. 2000) ("A <u>tenant</u> has a right not to have his or her possession interfered with except by lawful process[.]")[5] (Emphasis added); *Hawkins v. Greenfield*, 797 F. Supp. 30, 34 n.9 (D.D.C. 1992) ("A claim for breach of the covenant of quiet enjoyment can only lie against a <u>landlord</u> for acts by the landlord which interfere with the <u>tenant's</u> use and possession.") (Emphasis added).

As applied to the instant case, neither plaintiff has a cause of action for violation of the implied covenant of quiet enjoyment against Defendant DCS. DCS is simply not the landlord and therefore owes no covenant of quiet enjoyment to anyone. Moreover, Plaintiff Parsons is not owed any covenant of quiet enjoyment -- any such covenant runs solely in favor of the tenant -- not any invitees of the tenant. Not surprisingly, Plaintiffs cite no authority to support a conclusion that a claim for breach of the covenant of quiet enjoyment may be maintained by a non-tenant or may be maintained against a party who is not the lessor.

---

[5] The Court of Appeals also noted that a landlord-tenant relationship does not arise by mere occupancy of the premises and that an expressed or implied contractual agreement with both privity of estate and privity of contract is needed. *Id.* at 143.

Given that the Lease at issue contains an expressed provision concerning quiet enjoyment, Count III must be dismissed in its entirety because, in the presence of an expressed covenant of quiet enjoyment, any implied covenant is abrogated. To the extent the instant Court does not adopt that rule, then Count III should still be dismissed as it applies to DCS and also as it applies to Plaintiff Parsons since neither is a tenant or a landlord and the covenant strictly applies between landlords and tenants.

VI.    COUNT IV FAILS TO STATE A CAUSE OF ACTION FOR NUISANCE.

In Count IV of the Complaint, Plaintiffs IFSB and Parsons allege a cause of action of nuisance against Defendants 1225 and Davis. In that Count, Plaintiffs maintain that they lawfully occupy the Premises and that Defendants' act in implementing the Repositioning Project have "invaded and continue to invade Plaintiffs' right to be free from interference in their use and enjoyment of the Premises[.]") Complaint at para. 72. Plaintiffs claim an interference with the physical condition of the Premises, a disturbance of the safety, health and comfort of the occupants of the Premises, noise and vibration, dirt, debris and dust outside the Premises, presence of vermin, water damage, and interference with visibility of the bank. *Id.* Plaintiff Parsons maintains that his private use and enjoyment of the Premises is particularly adversely affected by noise and vibrations. Plaintiffs claim no physical injury to persons. Plaintiff Parsons has failed to state a cause of action in nuisance and his claim in Count IV of the Complaint should therefore be dismissed.

An action for private nuisance may be maintained only by those whose property rights have been invaded. *Holloway v. Bristol-Meyers Corp., 327 F. Supp. 17, 21 (D.D.C. 1971)* (Cause of action for private nuisance may be maintained "only by those whose property rights have been invaded."), *aff'd, 158 U.S. App. D.C. 20, 485 F.2d 986 (D.C. Cir. 1973)*. Accord,

*Carrigan v. Purkhiser,* 466 A.2d 1243 (D.C. 1983) (A claim of nuisance requires proof of an interference with the interest in the private use and enjoyment of one's land.)  As previously noted, Plaintiff Parsons has no possessory or property interest in the Premises, and he therefore can not state a claim for nuisance against anyone relating to the Repositioning Project. Accordingly, his claim for nuisance should be dismissed.[6]

## CONCLUSION

When this case is stripped of its fraudulently joined defendant (DCS) and fraudulently joined plaintiff (Parsons), what is left is what this case started out with earlier this year -- a dispute between a tenant (IFSB) and its landlord (1225) over alleged disruptions from the Repositioning Project.  Such is a matter this Court has already exercised jurisdiction over at IFSB's request, and is one which has been properly removed from District of Columbia Superior Court to the instant Court.  Defendants therefore request that Plaintiffs' motion for remand be denied and that the claims against Defendant DCS be dismissed with prejudice thereby eliminating it as a defendant, the claims of Plaintiff Parsons be dismissed with prejudice thereby eliminating him as a defendant, and that Count II alleging a breach of an implied covenant of quiet enjoyment be dismissed in its entirety, with prejudice.

---

[6]    The one nuisance  case  which Plaintiffs cite as support for the nuisance claim is *Anderson v. Washington Metropolitan Area Transit Authority,* 1991 WL 197024 (D.D.C. 1991).  Putting aside for the moment that *Anderson* is an unreported case, it is not contrary to the authority discussed above.  In *Anderson,* two homeowners sued the Washington Metropolitan Area Transit Authority ("WMATA") and its contractor for physical damage caused to their home by noise and vibrations resulting from demolition, excavation, and soil compaction related to the construction of a nearby parking garage.  The court held that the complaint stated a cause of action for private nuisance because defendants' activity was alleged to have invaded plaintiffs' use and enjoyment of "their property." Plaintiffs also cited *Souci v. William C. Smith & Co.,* 763 A.2d 96, 100 (D.C. 2000) which is a negligence case in which the court, in dicta, stated "a tenant has standing to pursue, *inter alia,* tort claims for negligence and nuisance against a third party whose actions caused the tenant "the loss of use and enjoyment of [his] property . . . and out of pocket expenses for repairs."  (Emphasis added) (Citation omitted).  Neither *Anderson* nor *Souci* provides any support for a cause of action in nuisance by someone not having a property interest.

GREENSTEIN DELORME & LUCHS, P.C.

Dated:  December 6, 2007

/S/  William C. Casano

Richard W. Luchs, #243931
William C. Casano, #352492
Joshua M. Greenberg, #489323
1620 L Street, N.W., Suite 900
Washington, DC  20036-5605
Telephone:  (202) 452-1400
E-mail:  rwl@gdllaw.com
E-mail:  wcc@gdllaw.com
E-mail:  jmg@gdllaw.com
*Attorneys for Defendants*
*1225 Connecticut Co. LLC and*
*Davis Construction Services, LLC*

# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL          .
SAVINGS BANK,                 .
                             .
          Plaintiff,          .    CA No. 07-1389 (JDB)
                             .
     v.                       .    Washington, D.C.
                             .    Tuesday, September 11, 2007
1225 CONNECTICUT CO., LLC,    .    10:25 a.m.
                             .
          Defendant.          .
                             .
. . . . . . . . . . . . . ..
              TRANSCRIPT OF ORAL RULING
         OF THE HONORABLE JOHN D. BATES
           UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          DALE A. COOTER, ESQ.
                            DONNA S. MANGOLD, ESQ.
                            Cooter, Mangold, Tompert & Wayson
                            5301 Wisconsin Avenue, NW
                            Suite 500
                            Washington, D.C. 20015
                            202-537-0700

For the Defendant:          RICHARD W. LUCHS, ESQ.
                            WILLIAM C. CASANO, ESQ.
                            Greenstein Delorme & Luchs, P.C.
                            1620 L Street, NW
                            Suite 900
                            Washington, D.C. 20036
                            202-452-1400

Court Reporter:             BRYAN A. WAYNE, RPR, CRR
                            Official Court Reporter
                            U.S. Courthouse, Room 6714
                            333 Constitution Avenue, NW
                            Washington, D.C. 20001
                            202-354-3186

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

                    Bryan A. Wayne, RPR, CRR
                    Official Court Reporter

```
 1                    P R O C E E D I N G S

 2            THE DEPUTY CLERK:  Your Honor, we have Civil Action

 3    07-1389, Independence Federal Savings Bank versus 1225

 4    Connecticut Company, LLC.  We have Ms. Donna Mangold

 5    representing the plaintiff, and Mr. William Casano representing

 6    the defendant.

 7            MS. MANGOLD:  Good morning, Your Honor.

 8            THE COURT:  Good morning to both of you.  I saw

 9    Mr. Luchs here earlier, but he couldn't stay apparently, and I

10    understand that Mr. Cooter might not be able to be here.

11            MS. MANGOLD:  He's still in trial.

12            MR. CASANO:  Yes, Mr. Luchs was here and he had to

13    leave a few minutes ago for a prior commitment.

14            THE COURT:  All right.  As I had indicated to you when

15    we were last together on Friday, I thought I would be prepared

16    to issue a decision today, and that the most efficient way to do

17    it, to get a decision into your hands would be to simply issue

18    an oral decision.  And this oral opinion, if you will, will

19    constitute the Court's findings of fact and conclusions of law

20    regarding plaintiff's motion for a preliminary injunction, as is

21    authorized under Federal Rule of Civil Procedure 52(a).

22        And I'm going to even put some headings in here and so

23    forth for the court reporter so that if and when you want a copy

24    of it, you'll get something that is more easily read.

25            Starting with an overview.  Plaintiff Independence Federal
```

1    Savings Bank, and I will call it, the plaintiff, IFSB, is a

2    federally chartered savings bank that has historically served

3    Washington, D.C.'s minority community.  IFSB has four branches

4    in the District of Columbia metropolitan area, two in the

5    District, one in Chevy Chase, Maryland, and another in Silver

6    Spring, Maryland.  Its headquarters and principal location is in

7    an office building at 1225 Connecticut Avenue, Northwest.  IFSB

8    leases commercial space on the ground floor of that building

9    from the defendant, 1225 Connecticut Company, LLC, which I will

10   call defendant or 1225.

11        After the building's largest tenant left earlier this

12   summer, 1225 initiated a renovation plan, its repositioning

13   project, that includes large-scale demolition of interior and

14   exterior portions of the building.  IFSB alleges in its amended

15   complaint that the repositioning project violates both its

16   rights under its lease with 1225 and an implied covenant of

17   quiet enjoyment.  IFSB seeks preliminary injunctive relief

18   barring 1225 from continuing the construction project or

19   undertaking planned asbestos abatement until the current lease

20   expires at the end of 2010.

21        Standard for preliminary injunction.  To obtain a

22   preliminary injunction, IFSB must demonstrate, first, a

23   substantial likelihood of success on the merits, 2, that it

24   would suffer irreparable injury if the injunction is not

25   granted, 3, that an injunction would not substantially injure

Page 4

1  other interested parties, and 4, that the public interest would

2  be furthered by the injunction.  Chaplaincy of Full Gospel

3  Churches v. England 454 F.3d 290, 297 D.C. Circuit 2006.

4  Injunctive relief, the D.C. Circuit has emphasized, "is 'an

5  extraordinary remedy that should be granted only when the

6  parties seeking the relief by a clear showing carries the burden

7  of persuasion.'"  That too is a citation to Chaplaincy of Full

8  Gospel Churches quoting Cobell v. Norton, 391 F.3d 251, 258,

9  D.C. Circuit 2004.

10      The four factors are to be weighed on a sliding scale such

11  that a strong showing as to one factor can compensate for a

12  weaker showing with respect to another.  CityFed Financial Corp.

13  v. Office of Thrift Supervision, 58 F.3d 738, 747, D.C. Circuit

14  1995.  The D.C. Circuit has also consistently affirmed the

15  denial of preliminary injunctive relief where the moving party

16  was unable to show any likelihood of success on the merits.

17  See, e.g., Trudeau v. FTC, 456 F.3d 178, 182, note 2, D.C.

18  Circuit 2006; Apotex Inc. v. Food & Drug Administration, 449

19  F.3d 1249, 1253-54, D.C. Circuit 2006; Katz v. Georgetown

20  University, 246 F.3d 685, 688, D.C. Circuit 2001.

21      In addition, the moving party must demonstrate at least

22  some irreparable injury.  Chaplaincy of Full Gospel Churches,

23  454 F.3d at 297.  While economic injury alone does not normally

24  qualify as irreparable, economic loss may constitute irreparable

25  harm in the commercial context where that loss threatens the

1   very existence of the moving party's business.  See Wisconsin

2   Gas Company v. FERC, 758 F.2d 669, 674, D.C. Circuit 1985.

3        Factual background of the case.  The lease agreement.

4        IFSB entered into a 12-year lease agreement with the

5   defendant's predecessor in 1998.  When that lease expired, IFSB

6   signed an amended agreement with another of defendant's

7   predecessors.  The agreement amended the square footage of the

8   space used by IFSB, established a new lease term of 10 years,

9   through December 31, 2010, and modified the landlord's

10  obligations by requiring it to provide two parking spaces at the

11  landlord's expense.

12       Now, I will note that I'm going to give some citations to

13  these things just so they're in the record.  Plaintiff's motion,

14  Exhibit B at paragraphs 2, 11.  In all other relevant respects

15  the amendment ratified the original lease and left it in full

16  effect.  Id. paragraph 14.

17       A few provisions of the original lease are particularly

18  important to this dispute.  Section 1.01 of the lease,

19  plaintiff's motion, Exhibit A, describes IFSB's space as a 6,450

20  square foot portion of the lobby "as delineated" on an attached

21  plan "and as presently constructed" and gives IFSB along "with

22  other tenants of the building and members of the public" a right

23  to use the common and public areas of the land and building

24  providing access to the leased premises."

25       Section 21.01 requires -- that's 21.01 requires the

1    landlord to provide hot and chilled water for heating and

2    cooling.  A neighboring section, 20.01, is the quiet enjoyment

3    provision, which bars the landlord from cutting off or ending

4    the tenant's rights under the lease prior to the expiration of

5    the term.

6        Two provisions cited by the parties speak to the landlord's

7    authority and responsibility to make repairs.  Most relevant is

8    section 16.02.  This section reserves to the landlord the right,

9    without the work amounting to an actual or constructive

10   eviction, or incurring liability to the tenant, "to change the

11   arrangement and/or location of public entrances, passageways,

12   doors, doorways, corridors, elevators, stairways, toilets, and

13   other public parts of the building."

14       The landlord can make these changes, however, only if the

15   leased premises remain "visible from the street," public access

16   to the bank from the street level is not "cut off," and there is

17   "no unreasonable obstruction of access to the leased premises or

18   unreasonable interference with the use or enjoyment thereof."

19       Finally, section 9.04 absolves the landlord of liability

20   for any "inconvenience, annoyance, or injury to business arising

21   from the making of any repairs, alterations, additions or

22   improvements in or to any portion of the building or the leased

23   premises," so long as the landlord "exercises reasonable

24   diligence so as to minimize any interference with the tenant's

25   business operations."  This section may, however, apply only

1    where the tenant has requested in writing that the landlord

2    conduct such repairs.

3        Now, the repositioning project.  Brookfield Properties, the

4    property manager for the 1225 building, informed IFSB in a May

5    11, 2007, letter of its intention to undertake a project to

6    bring a new look to the building.  Plaintiff's motion, Exhibit

7    C.  The letter indicated that work would begin on July 1, 2007,

8    and suggested that IFSB's president and CEO, Robert Isard, meet

9    with Brookfield representatives to discuss any concerns he may

10   have with regard to the project's impact on bank operations.

11   Id.

12       Isard already knew of the project, having met with two

13   Brookfield representatives in late April 2007.  Plaintiffs

14   reply, Exhibit B, paragraph 3.  1225 had fairly clear

15   motivations for timing the project as it did.  On June 30, 2007,

16   Ernst & Young, which had occupied 95 percent of the space in the

17   building since 1988, vacated the premises.  Plaintiff's

18   opposition, Exhibit 1, paragraph 10.  Ernst & Young's departure

19   left IFSB and Citibank, both on the ground floor, as the only

20   tenants remaining in the building.  Id. paragraph 11.

21       What does the repositioning project encompass?  In short,

22   it will result in the complete interior demolition of the second

23   through eighth floors of the building, improvements to the

24   lobby, limited removal of asbestos-containing materials

25   throughout the building, but not in the areas occupied by IFSB

Page 8

1   and Citibank, and the updating of certain systems.   Id.

2   paragraph 8.   The asbestos removal will be performed by a

3   licensed and certified contractor and, as of the date of

4   defendant's last filing, had not yet commenced.   The goal of

5   these reforms is to make the building a class A facility capable

6   of charging significantly more in rent per month.   Concretely,

7   whereas Ernst & Young paid $35 per rentable square foot, 1225

8   expects to charge $65 after the renovations.

9        Following the announcement of the repositioning project,

10  representatives of IFSB and Brookfield Properties spoke on

11  various occasions, either in person or over the phone.   One key

12  meeting -- attended by Isard and Morton Bender on behalf of IFSB

13  on June 12, 2007 -- was designed to give an overview of the

14  project, the scope of the work, and estimated schedule and

15  possible impact on the remaining tenants.   Defendant's

16  opposition, Exhibit 1, paragraph 14.

17       Isard and Bender claim that the meeting didn't accomplish

18  much of what was hoped and that they never received a copy of

19  the agenda that 1225 has now produced.   1225 counters that

20  despite its willingness to accommodate IFSB and to try to

21  address its concerns, IFSB deemed all proposed solutions

22  inadequate.

23       Bender met with another Brookfield representative on July

24  2, and was denied access to the project plans that he had

25  requested.   A follow-up phone call on July 9 likewise failed to

1  achieve any agreement.  In the wake of these contacts,

2  Brookfield sent IFSB a memo on July 20, 2007, estimating a time

3  line for the repositioning project.  Brookfield later informed

4  IFSB of the asbestos removal component of the project in a

5  letter dated July 25, 2007.

6      1225 obtained its demolition permit in the middle of July

7  and hired Davis Construction to begin work on the project.

8  Davis built its on-site field office and commenced demolition a

9  few weeks later, in late July 2007.  The repositioning project

10  is scheduled to stretch well into 2008.

11      The condition of IFSB.  Despite changes in leadership, IFSB

12  is still listed by the Office of Thrift Supervision, that's OTS,

13  as a minority institution because a majority of its board and

14  its customers, i.e., the account holders, are minorities.

15  Plaintiff's reply, Exhibit A, paragraph 3.  IFSB has suffered

16  severe operating losses over the last five years, causing OTS to

17  designate it as a problem institution and place it under a cease

18  and desist order.

19      The situation has not improved this year, with IFSB posting

20  losses of over $1 million for the first half of 2007.  Moreover,

21  ATM transactions at IFSB's 1225 Connecticut Avenue headquarters

22  have supposedly decreased by over 25 percent since the

23  repossessing project began.  Id. paragraph 10.  If these trends

24  continue, IFSB may qualify as an underperforming bank, rendering

25  it susceptible for a takeover by the OTS, with the accompanying

1   loss of shareholder equity.  To put things bluntly, IFSB is in

2   tenuous condition.

3        IFSB is obviously seeking to reverse this trend.  To that

4   end the new leadership is contemplating renovating its

5   headquarters in the 1225 building, changing the bank's name and

6   logo and implementing a new marketing campaign.  The bank faces

7   an uphill climb, however, in part because its customer base

8   still demands in-person transactions.  Specifically, unlike many

9   national banks, IFSB still serves 95 percent of its customers at

10  its branches (50 percent of those at its headquarters), with

11  only 200 out of more than 7,500 customers utilizing online

12  banking.

13       Nature and effects of construction.  At the heart of the

14  parties' dispute lie the effects of the repositioning project on

15  IFSB.  The bank portrays the circumstances as dire and forecasts

16  its own destruction.  Plaintiff's reply at 16.  Not

17  surprisingly, 1225 has a different view, acknowledging that the

18  construction is disruptive, but insisting that reasonable

19  measures have been taken to ameliorate the adverse effects and

20  abide by the lease agreement.

21       IFSB's most recent filing appears to assert seven ways in

22  which the project violates the terms of the lease and/or the

23  covenant of quiet enjoyment:  1, destruction of all but the

24  floors and supporting beams of the building; 2, removal of

25  asbestos while tenants remain in the building; 3, dust, debris,

1    noise and vibration from the construction; 4, failure to provide

2    air conditioning; 5, the site is an ongoing eyesore not suitable

3    for professional business; 6, the temporary replacement of

4    IFSB's windows with plastic sheets will prevent the bank from

5    implementing basic security measures; and 7, IFSB is

6    constructively evicted from the lobby for the duration of the

7    project.  That's set forth at plaintiff's reply at 19.

8        With respect to these allegations and others, the parties

9    have submitted a dizzying array of conflicting affidavits and

10   photographs.  It's hard to know how much weight to give to any

11   of these materials, all of which capture the ever-changing state

12   of affairs at only a moment in time.  But a few things are

13   clear.

14       First, extensive scaffolding has been erected around the

15   building.  Below the scaffolding is a covered walkway with

16   overhead lights that proceeds alongside the outside portion of

17   IFSB and Citibank.  The scaffolding and walkway obscure IFSB's

18   permanent sign.  1225 has responded by attaching to the

19   scaffolding and walkway two temporary signs, one of which

20   features IFSB's name in large purple letters, and the other of

21   which reads "Open During Construction."  The walkways are wide

22   enough for handicapped customers to reach IFSB's one accessible

23   entrance in a wheelchair.

24       This handicap-accessible entrance is on the N Street side

25   of the building where the so-called staging area is also

1   located.  The staging area is marked off with green mesh

2   construction fencing and barricades, and it eliminates the

3   metered parking spaces formerly available along N Street.  It

4   also prevents passersby from looking into IFSB from the street;

5   because the N Street side of the building is largely a glass

6   wall at ground level, customers could previously see directly

7   into the bank.  Plaintiff's reply, Exhibit B, paragraph 16.

8       The staging area has displaced the dumpster into which IFSB

9   deposited its trash.  1225 has sought to alleviate the

10  inconvenience by placing a yellow plastic trash can in the lobby

11  and offering to have its staff empty the can each evening.  Also

12  on the N Street side, Davis Construction has installed large red

13  trash chutes for removal of debris from the higher floors.  The

14  chutes were installed using a crane, which apparently still

15  remains.

16      Among the many other points of contention between the

17  parties, for example, dust and noise, safety and security,

18  rodent control, two appear to be of particular importance.  The

19  first is the air conditioning.  IFSB now contends that there has

20  been a consistent reduction in cooling capacity since work began

21  in July, and that the air conditioning system is now incapable

22  of maintaining the temperature below 85 degrees on a hot day.

23  Id.  In its original motion, IFSB accused 1225 of shutting down

24  the air conditioning early each night before all of the bank's

25  employees had left for the day.  Plaintiff's motion, Exhibit H,

1   paragraph 22.

2        1225 responds that under the lease it is obliged to provide

3   and does provide only chilled water to be used for cooling.  The

4   evening temperatures likely changed because Ernst & Young was

5   paying for extra cooling while it was moving between March and

6   June.  Backed by readings testing the temperature of the chilled

7   water, 1225 further avers that the water was between 41 and 48

8   degrees each day during the first two weeks of August 2007.

9   Defendant's surreply, Exhibit B, paragraph 7.

10        The second major area of contention is the asbestos removal

11  aspect of the repositioning project.  IFSB initially objected to

12  the lack of information about the removal, but now acknowledges

13  that it has acquired such information via this litigation.

14  Plaintiff's reply at 7.  The extensive plans produced by 1225

15  discuss the preparations and precautions being taken and

16  indicate how warning signs will appear around the building.

17  Defendant's opposition, Exhibit C, at 11.  IFSB emphasizes the

18  alarming nature of the signs and points to the devastating fear

19  felt by the 30 employees working at its headquarters.

20  Plaintiff's reply at 7-8 and 10.

21        These employees, IFSB contends, cannot maintain a positive

22  sales mentality when they fear exposure to a toxic substance.

23  Id. at 10 to 11.  In addition, IFSB has submitted photographs of

24  what it believes to be the asbestos-containing floor tiles

25  mentioned by 1225.  Defendant's opposition, Exhibit 1, paragraph

Page 14

1   9.  But 1225 counters with a sworn declaration, backed again by

2   testing, that the tiles in question do not contain asbestos and

3   were simply dislodged when Ernst & Young moved out.  Defendant's

4   surreply, Exhibit A, paragraphs 9 through 10.

5        In short, 1225 offers convincing testimony that the planned

6   asbestos removal will be properly and safely conducted,

7   including ambient air monitoring and air system control, with

8   minimal risk to IFSB employees and customers.

9        IFSB's other asserted areas of hazardous or unacceptable

10  conditions created by the repositioning project have been

11  largely addressed by evidence offered by 1225.  To begin with,

12  the bank security concerns raised by IFSB have been addressed in

13  1225's responses, and hence appear to have little force.

14  Similarly, the alleged fire code violations, fire hazards and

15  safety code violations do not hold up to scrutiny on the current

16  record, given the measures and efforts undertaken by 1225.

17       The scaffolding installation appears to be consistent with

18  the construction permit and site requirements, and although an

19  inconvenient eyesore, will not prevent access to IFSB's

20  premises.  Moreover, 1225 has provided clear and adequate

21  temporary signs.  1225 is making reasonable efforts to address

22  IFSB's trash removal concerns and to avoid any unnecessary or

23  overly disruptive closure of entrances resulting from work on

24  the facade.  No carbon monoxide from interior demolition

25  equipment is likely to penetrate IFSB's space.  And while rodent

1    control issues pose a real concern, the record does not

2    establish that the serious infestation that IFSB alleges and

3    fears, or indeed any infestation at all, has in fact occurred.

4         In the end, IFSB alleges that all of these difficulties

5    will have the effect of causing the bank to close its doors

6    and/or to move elsewhere.  This is an outcome that IFSB believes

7    is consistent with 1225's intent of remaking the building

8    completely.  IFSB points first and repeatedly to the decline in

9    ATM transactions.  It also relies on hearsay statements by some

10   of its customers commenting on the difficulty of gaining access

11   to the building and finding parking.

12        Beyond that, however, much of IFSB's case rests on

13   speculation -- speculation as to how its customers and staff

14   will react, how much business will be lost, and the dangers that

15   both future phases of the construction and the asbestos removal

16   project will pose.  IFSB worries in particular about the

17   potential for fires and leakage, possible damage to its

18   computers and other facilities, and the security risk posed by

19   removal of ceilings, roofing and/or windows.  The comprehensive

20   nature of the repositioning project makes all of these a

21   possibility, but the current record -- outside of the somewhat

22   rambling affidavit filed by IFSB's expert -- does not suggest

23   that any of the feared consequences are likely.

24        Entitlement to injunctive relief.  IFSB is not entitled to

25   the extraordinary remedy of an injunction barring 1225 from

1    continuing its renovation project or undertaking asbestos

2    abatement for the over three years remaining on IFSB's lease.

3    The first factor, likelihood of success on the merits, is close

4    to a wash.  IFSB relies primarily on three provisions of the

5    original lease:  air conditioning, 21.01, quiet enjoyment,

6    20.01, and changes to the premises, 16.02.

7         The first of these provisions is of little help to IFSB.

8    For starters, the plain language of the provision supports

9    1225's view that it is required to provide only chilled water,

10   not air conditioning.  1225 has documented the temperature of

11   the water provided during a two-week period in August, which

12   evidence IFSB contests via the subjective declaration of its

13   president and CEO that the system can't keep the air temperature

14   below 85 degrees on hot days.

15        Moreover, 1225 has explained that any perceived increase in

16   the evening temperature is likely due to the fact that the

17   building has been unusually cool during Ernst & Young's move,

18   IFSB's recent decision to stay open an hour later, and the

19   removal by IFSB of ceiling tiles that would normally keep cool

20   air in the leased premises.

21        The latter two arguments boil down to the same set of

22   fact-intensive questions -- is the repositioning project cutting

23   off or unreasonably obstructing access to the building, or

24   unreasonably interfering with IFSB's use and enjoyment thereof?

25   One threshold contention that must be rejected is 1225's

1    assertion, raised for the first time in its surreply, that

2    section 9.04 of the lease immunizes the landlord from damages

3    arising from repairs to the building or to the leased premises.

4    The location of this provision in the lease and its introductory

5    sentence, which was omitted by defendant 1225, may mean that the

6    limitation on liability applies only where the tenant requests

7    the repairs.  The second sentence of section 9.04 is somewhat

8    ambiguous, as it is not altogether clear whether it refers to

9    repairs, alterations and improvements "in or to any portion of

10   the building" even if not requested by the tenant (the situation

11   we have here).

12       But even if section 9.04 has broader application, it would

13   only insulate 1225 from liability to the extent 1225 was

14   reasonably diligent in minimizing interference with IFSB's

15   operations.  Any greater limitation on liability might leave

16   IFSB without an adequate damages remedy at law, making

17   injunctive relief more appropriate.

18       The parties' remaining arguments are not easily resolved.

19   On the one hand, section 16.02 of the lease contemplates that

20   the landlord will be able to alter public parts of the building

21   without either incurring liability or evicting IFSB, so long as

22   certain conditions are met.  The record evidence suggests that

23   1225 has made a good faith, if not always successful, effort to

24   meet these conditions.  1225 has sought to preserve IFSB's

25   visibility with signage, maintain both regular and handicapped

1   access, and prevent its construction company from obscuring the

2   sight lines into and out of the N Street side.

3        On the other hand, the construction is extensive and cannot

4   be described as anything other than disruptive.   IFSB has

5   submitted unrebutted declarations attesting to the noise,

6   vibrations, dust and debris caused by the construction.   While

7   1225 says that these problems are not especially acute, the

8   photographs reveal a building in some disarray, with pedestrian

9   and possibly also automobile access impeded.

10       But what it comes down to then is a question of

11  reasonableness, which in turn balances the landlord's right to

12  make alterations and the tenant's right to use and enjoyment of

13  the leased premises.   Defendant 1225 cites a case arising under

14  Florida law, Stinson, Lyons, Gerlin & Bustamante PA v. Brickell

15  Building 1 Holding Company, 747 F.Supp 1470, Southern District

16  of Florida 1970, which is affirmed at 923 F.2d 810, 11th

17  Circuit, 1991.   That case is cited to support the argument that

18  the balance here tips in favor of the landlord.

19       Although Stinson has somewhat similar facts, a large

20  commercial building being renovated to stay modern, a

21  disgruntled tenant claiming severe hardship, there are key

22  distinctions, most notably the absence in the lease of a quiet

23  enjoyment provision, and the presence of lease provisions giving

24  the landlord far more authority to make any changes it deemed

25  necessary.

1    In the end, although 1225 undoubtedly has the power and

2    discretion to make significant alterations to the building, IFSB

3    has introduced evidence suggesting that the renovations may

4    interfere with the use and enjoyment of the leased premises, and

5    that IFSB therefore has at least some chance to succeed on the

6    merits of its claims.

7    The standard for preliminary injunctive relief, however, is

8    that the movant must show a substantial likelihood of success on

9    the merits.  That, I conclude, IFSB has not done.  1225 has

10   adequately addressed many of IFSB's allegations of breach and

11   overall has made reasonable efforts to avoid or minimize the

12   disruption and inconvenience the repositioning project will

13   cause to IFSB.

14   IFSB must next show that it will suffer irreparable harm

15   absent an injunction.  A showing of some harm is an absolute

16   requirement for issuance of a preliminary injunction.  IFSB has

17   likely cleared this minimum threshold.  What it has not done,

18   however, is demonstrate that any harm it suffers will be

19   irreparable.  IFSB has identified potential economic harm but

20   has not shown why this harm could not be redressed with an award

21   of money damages for breach of the lease after a trial on the

22   merits.

23   As explained above, economic harm will qualify as

24   irreparable only when the loss threatens the very existence of

25   the moving party's business.  See Wisconsin Gas Company v. FERC,

1    758 F.2d 669, 674, D.C. Circuit 1985.

2        IFSB's evidence on this front is inadequate.  The decline

3    in ATM transactions in 2007, from May and June to July and

4    August, is worth very little without evidence of what has

5    happened in prior years, especially since the city's population

6    tends to decrease in the summer months.  Nor do the hearsay

7    statements from customers advance the ball.  Those customers of

8    course made their way to the bank and completed the contemplated

9    transactions.  Although they were unhappy with the conditions,

10   they have not left IFSB.

11       The remainder of IFSB's case for irreparable harm is wholly

12   speculative.  IFSB fears that customers will stop coming to its

13   headquarters branch because of the appearance or the difficulty

14   of finding parking.  Whether the latter fear is justified

15   remains unclear, since 1225 seems to think that Ernst & Young's

16   departure has made parking easier.  There is also nothing in the

17   record beyond IFSB's guesses and intuition to support the fear

18   that the appearance of the facilities will turn customers away.

19       And while it stands to reason that employees will be

20   affected by the constant noise and possible dust, the one

21   declaration supplied by IFSB does not indicate how this will

22   translate into the kind of lost business that would sink the

23   bank forever.  Although it may be understandable that IFSB would

24   have a difficult time under the circumstances producing evidence

25   rather than merely speculation of future severe economic harm or

1    risk to the ongoing business, it remains the case that such

2    speculative harm is not enough.  See Wisconsin Gas, 758 F.2d at

3    674.

4        Perhaps IFSB's strongest argument -- certainly one of its

5    most recurring -- is that the harm in this instance need not be

6    great because the bank is already teetering on the edge.  That

7    may well be so, and it may be something to take into account

8    when balancing the equities.  But IFSB has not pointed to any

9    principle of law under which vulnerable parties bear a lesser

10   burden of showing harm than do others.  Hence, the standard

11   remains the same, and under Wisconsin Gas IFSB must demonstrate

12   a real and immediate risk of harm that is certain, great, and

13   irreparable.  Again, IFSB has not done so.

14       The speculative nature of the harm IFSB will suffer weighs

15   heavily against the award of the sweeping injunctive relief that

16   it seeks.  Indeed, it's worth emphasizing that IFSB seeks an

17   injunction that would completely prohibit 1225 from continuing

18   the repositioning project -- that is, both the renovations and

19   the asbestos removal -- until after the end of IFSB's lease on

20   December 31, 2010.  In other words, IFSB would stay at its

21   current location, ostensibly with the construction equipment

22   removed, through the end of its lease term.  IFSB would then

23   presumably move away from the unique location that it claims to

24   treasure, allowing 1225 to resume the project only at that time.

25       This is truly an extraordinary scenario and not one that

1    IFSB's relatively weak showings at the first two steps of the

2    test for preliminary injunctive relief can justify.  At the

3    third step, the Court must of course consider the harm to

4    defendant 1225 if an injunction is entered.  That harm, while

5    also economic, is considerable.  1225 estimates the potential

6    harm from delay while the building is largely unleased as

7    between 600,000 and 1.3 million a month, plus the cost arising

8    from construction expenses.

9        The significant hardship a three-year pause would impose on

10   defendant 1225, arguably just as daunting as the challenges

11   faced by IFSB, certainly weighs against the injunction

12   requested.  Unless and until IFSB produces evidence of some real

13   threat to its continuing existence caused by the repositioning

14   project, the balance of these competing harms does not favor

15   IFSB.

16       Finally, the public interest does not appreciably favor the

17   relief sought.  It is at this point that IFSB's status as a

18   troubled yet historically significant minority-run institution

19   comes into play.  The public surely has an interest in such

20   institutions thriving -- let me repeat that.  The public surely

21   as an interest in seeing such institutions thrive and survive.

22   But that interest is less compelling where, as here, the

23   institution seeks sweeping and invasive judicial intervention to

24   protect it from vulnerabilities of its own making.  In the end,

25   that modest public interest favoring relief cannot compensate

1  for a moderate chance of success on the merits, a speculative

2  claim of irreparable harm, and demonstrable harm to the party

3  whose conduct would be enjoined.

4      Accordingly, applying the well-established four-part test

5  for the extraordinary preliminary injunctive relief sought here,

6  the Court concludes that IFSB has not met its considerable

7  burden.  The motion for a preliminary injunction is therefore

8  denied.  A separate order will be issued today.  The parties

9  should confer to suggest the course of, and schedule for,

10  further proceedings in this matter.  And the order will indicate

11  that.

12      In closing, I want to note, as was done at the hearing last

13  week, that the Court intends to continue to scrutinize the

14  developing situation with the repositioning project and its

15  impact on IFSB.  Should the Court be faced with new evidence of

16  sufficiently concrete and irreparable, as opposed to

17  speculative, harm to IFSB and its very existence, further

18  consideration of the extraordinary remedy of a preliminary

19  injunction may be warranted.  1225 should, therefore, continue

20  to bear in mind its obligations under the lease and the implied

21  covenant of quiet enjoyment, including the obligation to avoid

22  unreasonable interference with IFSB's use and enjoyment of the

23  premises.

24      With that, as I said, I will issue an order today, and that

25  order will deny the motion for preliminary injunction and will

1   also govern further proceedings in this matter.  With that, I

2   have finished giving this opinion.

3       Anything the parties need to ask me about now?

4           MS. MANGOLD:  Nothing further, Your Honor.

5           MR. CASANO:  No, Your Honor.  Thank you.

6           THE COURT:  All right.  Thank you.

7       (Proceedings adjourned at 11:05 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

\* \* \* \* \* \*

CERTIFICATE

 I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

      _____

      BRYAN A. WAYNE

      Bryan A. Wayne, RPR, CRR

      Official Court Reporter

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS    :
BANK, et al.,    :
    :
        Plaintiffs,    :
    :
v.    :    Case No. 07-cv-2090 (JDB)
    :
1225 CONNECTICUT CO. LLC, et al.    :
    :
        Defendants.    :
    :

## <u>AFFIDAVIT OF EDWARD GREEN, III</u><br><u>IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND</u>

I, EDWARD GREEN, III under penalty of perjury, state as follows:

1.     I am over twenty-one (21) years of age and make this Affidavit based on matters within my personal knowledge in support of Defendants' Opposition to Plaintiff's Motion to Remand.

2.     I am a Senior Project Manager for James G. Davis Construction Corporation ("DAVIS"). DAVIS is a Virginia corporation registered to do business in Washington, D.C.

3.     DAVIS is the general contractor hired by Brookfield Properties Management LLC ("Brookfield") in connection with the repositioning project (the "Repositioning Project") occurring at 1225 Connecticut Avenue, N.W. in Washington, D.C. 20036 (the "Property").

4.     I previously provided an affidavit in connection with an earlier action commenced by Independence Federal Savings Bank seeking to enjoin the Repositioning Project (Civil Action No. 07-1389).

5.     In that affidavit, and again here, I averred that DAVIS is the general contractor for the Repositioning Project. In that capacity, DAVIS has placed signs on the Property identifying

the general contractor as "Davis Construction." DAVIS typically refers to itself either as "DAVIS" or "Davis Construction" when promoting its activities.

      6.    Davis Construction Services LLC (typically known as "Davis Services") is a separate company and is a subsidiary of DAVIS. Davis Services is not in any way involved in the Repositioning Project.

_____
Edward Green, III

320745\1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS
BANK, *et al.*

        *Plaintiffs*,

v.

1225 CONNECTICUT CO. LLC, *et al.*

        *Defendants.*

Civil Action No. 07-2090 (JDB)

## AFFIDAVIT OF SIMON CARNEY
## IN OPPOSITION TO MOTION FOR REMAND

I, SIMON CARNEY, under penalty of perjury, state as follows:

1.      I am over twenty one (21) years of age and make this Affidavit based on matters within my personal knowledge in opposition to Plaintiffs' motion for remand.

2.      I am the Vice President and Regional Counsel for Defendant 1225 Connecticut Co., LLC. ("1225").

3.      As 1225 previously informed this Court and Plaintiff Independence Federal Savings Bank ("IFSB") in Case No. 07-1389 (JDB), James G. Davis Construction Corporation ("Davis") is the general contractor for the Repositioning Project currently underway at 1225 Connecticut Avenue, N.W., in Washington, D.C. (the "Property"). See Civil Action No. 07-1389, 1225's Response to Plaintiff IFSB's Reply Concerning Amended Application for Preliminary Injunctive Relief (08/31/07) and Exhibit D thereto, Affidavit of Edward Green, III.

4.      Both 1225 and James G. Davis Construction Corporation itself refer to the latter entity as "Davis Construction" or "Davis."

5.    The names "Davis Construction" or "Davis" have not been used by 1225 to refer to any other entity, and certainly have not been used to refer to a separate business entity, Defendant Davis Construction Services, LLC, which has nothing to do with the Repositioning Project.

_____
Simon Carney

326821v1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INDEPENDENCE FEDERAL SAVINGS BANK | : |
| Plaintiff, | : |
| v. | :      Case No. 07-cv-1389 (JDB) |
| 1225 CONNECTICUT CO. LLC | : |
| Defendant. | : |

## AFFIDAVIT OF EDWARD GREEN, III IN OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

I, EDWARD GREEN, III under penalty of perjury, state as follows:

1.     I am over twenty-one (21) years of age and make this Affidavit based on matters within my personal knowledge in support of the Opposition of Defendant 1225 Connecticut Co. LLC("1225") to Plaintiff's Application for Preliminary Injunctive Relief.

2.     I am a Senior Project Manager for James G. Davis Construction Corporation ("Davis"), working out of Davis' office located at 1430 Spring Hill Road, McLean, Virginia. Davis is the general contractor hired by Brookfield Properties Management LLC ("Brookfield") in connection with the renovation project (the "Renovation Project") occurring at 1225 Connecticut Avenue, N.W. in Washington, D.C. 20036 (the "Property").

3.     I have been employed by Davis for nine (9) years as a project manager on numerous commercial construction projects in the District of Columbia.

### FIRE CODE COMPLIANCE

4.     The emergency exit from Independence Federal Savings Bank ("Independence"), located on the N Street elevation has a covered walkway leading away from the Property towards

the driveway servicing the parking garage. *See, Exhibit 10 to Affidavit of Henry Doyle (the "Doyle Affid. "), Photographs of Emergency Exit and Parking Garage.* The exit point for this covered walkway is free of any obstruction or impediments. *Id.*

5.    Access to the emergency standpipes servicing the Property is not impeded or otherwise restricted. *See, Exhibit 9 to Doyle Affid., Photographs of Standpipes.* The scaffolding has been configured to allow for maximum accessibility to the standpipes from the adjacent streets. *Id.* Additionally, signage has been placed identifying each standpipe. *Id.*

6.    Davis has arranged for signage to be installed on the scaffolding clearly and prominently identifying the Property as "1225 Connecticut Avenue." The installation of this signage is scheduled for Friday, August 31, 2007.

### FIRE HAZARD PROTECTIONS / ELECTRICAL SYSTEMS

7.    During the removal of the pre-cast façade on the N Street elevation, no "explosive dust" was revealed.

8.    Davis has taken reasonable precautions to prevent the outbreak of fire during the pre-cast façade removal, interior demolition or any other construction work involving cutting, torching or the use of any open flame. Specifically, Davis has installed temporary hose connections on each floor of the Property. Any work that involves torches, open flame or activities that produce "sparks" (including, but not limited to cutting of pipes or ducts) is done in compliance with a "hot permit." The hot permits require the posting of a fire watch at the location where the work is being performed, as well as a fire extinguisher and dousing water. At the end of each day that work is performed pursuant to a "hot permit," the contractor with the permit is required to wait thirty (30) minutes past the stop work time, conduct a walkthrough inspection to ensure that conditions are satisfactory and then sign out. The interior standpipes

will remain operational on each floor. Existing fire sprinkler coverage will remain operational on floors where demoltion is not being performed. As additional precautions against fire, the use of wet blankets is mandated for the cutting of any pipes.

9.    The first stage of the interior demolition is the draindown of the sprinkler system on the impacted floors of the Property. The draindown will have no impact on the 1st floor of the Property. The standpipes and fire closets on each of the floors will remain energized and available in the event of an emergency. The demolition crews will have a fire watch posted, along with the placement of fire extinguishers throughout the Property.

10.    There are no electrical or water outages planned for "on-hours." The Property is equipped with a generator for back-up power in the event of an unforeseen electrical interruption.

### SAFETY CODE COMPLIANCE

11.    Davis has installed overhead lighting on the inside of the covered walkways. *See, Exhibit 7 to Doyle Affid., Photographs of Covered Walkway.*

12.    The covered handicapped walkway along the N Street elevation of the Property has sufficient clearance widthwise to allow for the use of a wheelchair. *See, Exhibits 8 and 8.1 to Doyle Affid., Photograph of Handicapped Accessible Walkway.* The entrance to the covered handicapped walkway, located on the 18th Street/Connecticut Avenue elevation of the Property, is free of any obstruction or impediments. *Id.*

13.    Contrary to the assertions of Independence, the Pepco storage vaults are located within the Staging Area and Pepco's access to the storage vaults is no way impeded or otherwise restricted, either in the case of an emergency or otherwise. Pepco may enter the Staging Area through the 18th Street / N Street non-staging area.

3

14.     To allow for the installation of the demolition chutes on the N Street elevation, an entire tier of pre-cast façade needed to be removed.  During the removal of the pre-cast façade it was noted that the pre-cast façade was in a good and sturdy condition with no crumbling observed.  Based on this observation, there is a reduced likelihood of significant falling debris during the removal of the pre-cast façade from the Property.

### WATER PENETRATION PRECAUTIONS

15.     In order to protect the remaining two (2) tenants of the Property from leaks or other water infiltration, Davis will be sealing off the 1st floor from the rest of the Property.  A temporary waterproofing membrane will be installed over the second floor slab and existing penetration points (e.g., for pipes) will be caulked and waterproofed.  A temporary poly covered partition, installed from the floor slab to the ceiling slab above, will enclose the entire perimeter of the second and third floors.  This work will commence in September.

### ERECTION OF SCAFFOLDING

16.     The overhead protection installed on the Connecticut Avenue portion of Independence's leased space, which Independence suggests was installed "at least 30 weeks too early" is a requirement pursuant to the Public Space Permit obtained for the Renovation Project. The Public Space Permit is for the entire Renovation Project and is not separated by the different elevations (i.e., N Street side, 18th Street/Connecticut Avenue side), nor can compliance with the Permit be phased in (in other words, all requirements of the Permit must be met at this time).

### DEMOLITION OF PRE-CAST FAÇADE

17.     It will take approximately three (3) weeks to remove the pre-cast façade from the 18th Street/Connecticut Avenue side of the Property.  Work will commence above the

Independence space and move south down 18th Street/Connecticut Avenue towards the Citibank space.

18.    The removal of the pre-cast façade from the Property will commence in the northeast corner of the Property on the N Street elevation (above the entrance to the parking garage), then move counterclockwise to the 18th Street/Connecticut Avenue elevation and conclude with the alley-way elevation.

19.    The removal of the pre-cast façade is conducted in columns, starting at the top of the Property and moving down to the street level in a piece-by-piece, column by column manner.

20.    With respect to the removal of the pre-cast façade located above the entrance to Independence, Davis will take all reasonable measures to minimize any disruption to the operation of Independence.

21.    During the removal of the pre-cast façade, a debris netting system will be installed to arrest the fall of any debris which may break off. The netting will run from the rooftop down to the street level of the particular section of the Property which is being worked on at that time. The netting will not cover those portions of the front façade not being worked on.

22.    During the removal of the pre-cast façade, the covered walkway currently located on the 18th Street/Connecticut Avenue elevation of the Property will be altered. The side of the walkway closest to the Property will be secured from the sidewalk to the top of the walkway with clear plexi-glass. The plexi-glass will allow for continued visibility of Independence along with the requisite amount of safety precautions for conducting overhead construction. There will be no increase in the height of the plywood which is currently installed on the street side of the walkway.

320745\1

23.    The installation of the new curtainwall façade will be done via a monorail and cable system on the roof of the Property.  Specifically, each piece of the new curtainwall façade will be lifted via crane, from the N Street elevation, into the Property on the appropriate floor where it will be installed.  The installation of the curtainwall façade is done on a floor by floor basis around the building.  There will be multiple crews working on the installation of the new curtainwall façade to have work progress on an expeditious basis.

**DUST AND DEBRIS**

24.    The ceiling panels that Independence claims were removed and which it contends allows dust to enter its leased space were not removed by Davis in preparation for the Renovation Project.  Davis is unaware of who removed the panels or why.

**USE OF "BOBCATS" FOR INTERIOR DEMOLITION**

25.    The Bobcats utilized in the interior demolition of the Property are equipped with "scrubbers" designed to reduce the amount of emissions.  Davis has used Bobcats in interior demolition of occupied buildings in the past and has not had a problem with carbon monoxide emissions.

26.    The Bobcats will only be employed on floors 3 through 8 at the Property.  Any interior demolition on the 2nd floor will be done without the assistance of the Bobcats.  The 2nd floor "soft architectural demolition" or removal of the tenant's build-out (i.e., pull up carpeting, removal of the acoustical grid) will be performed by hand.

27.    Independence does not draw its air supply from the office portion of the Property, but rather it is self-contained.

6

### RODENT PRESENCE

28.    During the removal of the pre-cast façade on the N Street elevation, no rodent nests were revealed.

### ASBESTOS

29.    As of the date of this Affidavit, no asbestos abatement has begun, nor have any asbestos containing materials been disturbed.

### SECURITY PRECAUTIONS

30.    Since the commencement of the Renovation Project, Davis is not aware of any instances of crime at the Property.

31.    The removal of the pre-cast façade is for floors 2 through 8.

32.    None of the demolition of pipes, ducts or wiring that will be performed at the Property will require access into the Independence space.

### CONSTRUCTION STAGING AREA

33.    The size of the construction staging area on the N Street side of the Property (the "Staging Area") is mandated by the Public Space Permit. Davis is not using the full allotment as provided by the Public Space Permit. Specifically, Davis has carved out an area in front of Independence on the corner of N Street and 18th Street/Connecticut Avenue, and the same remains unused by any construction personnel. *See, Exhibit 6 to Doyle Affid., Photographs of Staging Area.* This section of the Staging Area remains enclosed by the fence to prevent unauthorized access to the Staging Area and to prevent any vehicles from parking by the Property. *Id.*

7

34. The green mesh fence lining that has been installed on the fence that delineates the Staging Area is for security and aesthetics. This type of fence line helps to obscure the Staging Area from pedestrian and vehicular traffic, maintain the overall appearance of the construction sight and reduce the likelihood of theft and/or vandalism at the construction sight.

Edward Green, NI





| DC HOME | ABOUT DC | RESIDENTS | BUSINESS | VISITORS | DC GOVERNMENT | DC KIDS |

WELCOME TO WASHINGTON
**District of Columbia**



MAYOR
Adrian M. Fenty

## Organization Information

**DCRA HOME**
**SERVICES**
**INFORMATION**
**ONLINE SERVICE REQUESTS**

## Online Organization Registration
### Search Registered Organizations

**Organization Details - Step** 1  2  3
To view another organization from the search, select the **Return to Search Results** button below. You may also print the organization details, or start a **new search**. Use the **Back to Main Page** button to continue the registration process.

| Organization | | Registered Agent |
|---|---|---|
| **Organization Name:** | JAMES G. DAVIS CONSTRUCTION CORPORATION | C T Corporation System |
| **State:** | VA | 1015 15th Street, N.W. Ste. 1000 Washington, DC 20005 |
| **Status:** | ACTIVE | |
| **Initial Date of Registration:** | 3/28/1966 | |
| **File No.:** | 660485 | |
| **Organization Type:** | FOREIGN BUSINESS CORPORATION | |

[ << Back to Main Page ]   [ Return To Search Results ]   [ Print Results ]   [ New Search ]

For more information, contact the Corporations Division at (202) 442-4432 or Ask the Director .

Government of the District of Columbia
Citywide Call Center : (202) 727-1000
TTY/TDD Directory

Telephone Directory by Topic  |  Agencies  |
DC Council  |  Search  |  Elected Officials
Feedback  |  Translation  |  Accessibility  |
Privacy & Security  |  Terms & Conditions

John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

http://mblr.dc.gov/corp/lookup/status.asp?id=65414                    11/28/2007

# EXHIBIT F

22 of 23 DOCUMENTS


Cited
As of: Nov 13, 2007

## CARMEL CASTELVETRO, ET AL v. JOHN M. MILLS, ET AL

## NO. 32 03 96

## SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF NEW HAVEN

*1994 Conn. Super. LEXIS 270*

**January 31, 1994, Decided**
**February 1, 1994, Filed**

**NOTICE:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**JUDGES:** GRAY

**OPINION BY:** BY THE COURT; LEANDER C. GRAY

**OPINION**

MEMORANDUM OF DECISION

The named defendants, dba GM Associates ("GM"), moved to strike counts two and five of the complaint on the ground that Connecticut law does not recognize an implied warranty of fitness for intended use ("implied warranty of fitness") in commercial leases. The defendants moved to strike counts three and six which alleged breach of contract, on the ground that the plaintiffs failed to allege that they were third-party beneficiaries to GM's contract with plaintiffs' employer Gravymaster, Inc. ("Gravymaster").

The plaintiffs are former employees of Gravymaster and worked in a building that is alleged to have been constructed or maintained in a manner that caused plaintiffs to become ill. Gravymaster, which did not own the building, executed a lease agreement with GM. Parties involved in the design and construction of the building are also named as defendants; i.e.; ABC Mechanical Engineering and Contracting, Inc.; F & F Mechanical Contractors, Inc.; [*2] D & M Engineers & Land Planners.

Counts one, two and three of the complaint are brought on behalf of the plaintiff Castelvetro. Counts four, five and six are brought on behalf of the plaintiff Fritz. Each plaintiff alleges the same causes of action in her respective set of claims.

"The function of a motion to strike is to challenge the legal sufficiency of the allegations as set forth in the pleadings." *Ferryman v. Groton, 212 Conn. 138, 142, 561 A.2d 432 (1989)*. The motion may also be used to test whether Connecticut is "ready to recognize some newly emerging ground of liability." *Durham Aqueduct Co. v. C. E. Burr & Co.*, 8 Conn. L. Trib. No. 13, pp 11, 12 (Super Ct., November 30, 1981, Higgins, J.). "In deciding on a motion to strike or a demurrer, a trial court must take the facts to be those alleged in the [pleading], and cannot be aided by the assumption of any facts not therein alleged." *Liljedah Bros., Inc. v. Grigsby, 215 Conn. 345, 348, 576 A.2d 149 (1990)*. The court must construe the facts pleaded in the manner most favorable to the nonmoving party. *Rowe v. Godou, 209 Conn. 273, 278, 550 A.2d 1073 (1988)*.

At issue is whether the plaintiffs have asserted [*3] a legally recognized cause of action in claiming that they are entitled to it the benefit of an implied warranty of fitness in a commercial lease to which the plaintiffs were not parties. The easy answer is that such a claim is a question of law rather than a factual allegation and as such, Connecticut does not recognize such a warranty in

1994 Conn. Super. LEXIS 270, *

commercial leases. While some states have expanded the concept to commercial leases *[Davidow v. Inwood N. Professional Group-Phase I, 747 S.W. 2d 373, 375 (Tex. 1988); Meyer v. Parkin, 350 N.W. 2d 435 (Minn. App 1984)]*, the general rule, adopted by the majority of states, is that a right to use commercial premises for a specified purpose does not ordinarily imply a warranty on the landlord's part as to the fitness of the premises for the use. M. Friedman, *Friedman on Leases*, ch. 27, #27, 402, p. 1404.

The general rule rests upon recognition of the great disparity between residential and commercial tenants which does not lend itself to imposing liability in the case of commercial leases. See, *Friedman, supra,* 1407. In this instance, the plaintiffs have failed to state a claim upon which relief can be granted and, accordingly, [*4] the motion to strike counts two and five of the complaint is granted.

The remaining counts addressed by the motion to strike concern the plaintiffs' claim that GM breached its contract with Gravymaster by failing to meet certain express and implied requirements of the lease: it failed to provide quiet enjoyment of the property; failed to maintain and manage the property in a habitable, hazard-free condition; failed to provide a building fit; for human occupancy; and failed to provide premises which met state and local standards regarding air quality. The plaintiffs claim that as employees of Gravymaster, they were third-party beneficiaries to the lease.

A third-party beneficiary may sue to enforce a contract. *Colonial Discount Co. v. Avon Motors, Inc., 137 Conn. 196, 200, 75 A.2d 507 (1950)*. However, a person who is neither a party to a contract nor a contemplated beneficiary cannot sue to enforce the promises of a contract. *Coburn v. Lenox Homes, Inc., 173 Conn. 567, 570, 378 A.2d 599 (1977)*.

A third-party seeking to enforce contractual rights must allege that the contracting parties intended that the promisor should assume a direct obligation to the third-party. [*5] *Stowe v. Smith, 184 Conn. 194, 196, 441 A.2d 81 (1981)*.

> To determine the intent of the parties to a contract is a matter of interpretation of the contract. . . . The ultimate test to be applied is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party and that the intent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties.

*Colonial, supra, 200-01.*

Here, the plaintiffs conclude that because they were employed by Gravymaster, they thereby became third-party beneficiaries of the lease between their employer and GM. No factual allegations were cast to support this conclusion. Nor do the plaintiffs allege that the lease reflected any intent by GM to assume a direct obligation to Gravymaster employees. "A motion to strike is properly granted where a plaintiff's complaint alleges legal conclusions unsupported by facts." *Mora v. Aetna Life & Casualty Ins. Co., 13 Conn. App. 208, 211, 535 A.2d 390 (1988)*.

The motion to strike counts three and six of the complaint is granted.

BY THE [*6] COURT

LEANDER C. GRAY, JUDGE